Filed 5/20/22  P. v. Boyd CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN BOYD,<br><br>Defendant and Appellant. | F078502<br><br>(Fresno Super. Ct. No. F18904018)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

In an amended information filed July 13, 2018, the Fresno County District Attorney charged defendant Jonathan Boyd with several prostitution related crimes concerning three victims: Michelle M., Jessica D. and minor Toni B.

**Charges Related to Victim Toni B.**

As to victim Toni B., defendant was charged with human trafficking of a minor for a sex act (count 1; Pen. Code, § 236.1, subd. (c)(2))[1] in a manner involving force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury (see § 236.1, subd. (c)(2)); pimping a minor (count 2; § 266h, subd. (b)(2)); lewd act upon a child (count 3; § 288, subd. (c)(1)); and pandering of a minor under age 16 (count 4; § 266i, subd. (b)(2)). The information alleged Toni was 13 or 15 years old when the lewd act was committed upon her.

**Charges Related to Michelle M.**

As to Michelle M., defendant was charged with human trafficking to commit another crime (count 5; § 236.1, subd. (b)); kidnapping to commit another crime (count 6; § 209, subd. (b)(1));[2] and forcible rape (count 7; § 261, subd. (a)(2)).

**Charges Related to Victim Jessica D.**

As to victim Jessica D., defendant was charged with pimping (count 8; § 266h, subd. (a)); and pandering (count 9; § 266i, subd. (a)(2)).

**Additional Allegations**

The complaint further alleged defendant had suffered a prior strike (§§ 667, subd. (b), 1170.12, subds. (a)–(d)) and three prior prison terms (§ 667.5, subd. (b)).

**Verdicts and Sentence**

A jury convicted defendant of counts 1 through 4 and 8 through 9 and found true the special allegation on count 1. In a bifurcated proceeding, the trial court found the strike and prior prison term allegations true. The jury found defendant not guilty on counts 5 and 7.

On count 9, the court selected the upper term of 6 years, which was doubled to 12 years due to defendant's prior strike. On count 1, the court imposed a consecutive

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] This charge was subsequently dismissed at the request of the prosecutor.

2.

term of 30 years to life (15 years to life, doubled). Imposition of sentence on the remaining counts was stayed pursuant to section 654.[3] The court also struck "imposition of penalty" on the prior prison term allegations.

**TRIAL EVIDENCE**

**Events Involving Michelle M.**

Michelle M. testified that in January 2016, she spoke with law enforcement about a sexual assault. At the time of the assault, Michelle was homeless and looking for a place to stay at a Fresno hotel. While at the hotel, she ran into defendant,[4] whom she had met before. Eventually, she entered a hotel room with defendant. Defendant's cousin was also in the room. Defendant asked Michelle if she wanted to "work for him" – which she understood to be a reference to prostitution. Michelle declined, as she had in the past.

Defendant became upset. Defendant engaged in sexual intercourse with Michelle against her will. She physically fought against sexual contact for "a little bit." The intercourse was forceful and painful. The "forcefulness" of the sexual contact caused Michelle to bleed. Afterwards, defendant left threatening voicemails and sent threatening text messages to Michelle. One of the messages was that defendant would "put" her "away," and nobody would find her.

Michelle's description of the relevant events to law enforcement before trial had some aspects that diverged from or added to the events she described at trial. For example, Michelle told law enforcement that she had been grabbed from behind and pulled into a motel room. However, she did tell law enforcement that defendant had raped her in the motel room. A rape kit was used five to eight days after the assault and no semen was detected. A year and a half later, Michelle was shown a six-pack

---

[3] The stayed terms were 16 years on count 2, six years on count 3, 16 years on count 4, and 12 years on count 8.

[4] Michelle only knew the individual as "Blue." At trial, she identified defendant as the man she knew as "Blue."

3.

photographic lineup. She identified defendant as the person who had raped her with "certainty."

Michelle told law enforcement that defendant was encouraging her to work for him, and that she knew he had prostitutes working for him. Defendant also wanted her to do "possibly internet-type activity and making videos of her doing things … for people to watch."

Michelle had a significant criminal history, including a conviction for burglary in 2014 and a guilty plea to charge of possessing a dirk or dagger in 2017. Michelle's relative, Efrain, testified that she did not tell him she had been raped until they were in the emergency room. The motel where the rape allegedly occurred had no record of defendant staying there.

**Events Related to Toni B.**

Eileen E. is the mother of Toni B. In February 2018, Toni was living with Eileen. Eileen heard Toni yelling, "[N]o" on the phone. Eileen asked Toni if she was okay and who she was speaking to on the phone. Toni responded that she did not want to "go anywhere." Eileen reassured her that she was not going anywhere. Toni said, "But if I don't go … he says he's going to kill me.…" Eileen described Toni as "literally going crazy," so she called police. Before the police arrived, Toni said she wanted to kill herself. Toni said, "[T]hey're going to kill me anyways." Toni said that she had to go to the corner store, and if she was not there, "he's going to shoot me."

Toni complained about pain in her vaginal area. Eileen initially thought the issue could be related to menstruation. However, once Eileen inspected Toni and saw that her vaginal area was swollen, she knew it was not related to menstruation.

Officer Ying Vang responded to the home. Officer Vang was a student resource officer at Toni's school and was familiar with her family. When he arrived, Toni was in the bathroom with the door locked. Toni was yelling at the top of her lungs about pain inside her vagina, "bleeding, hurting, itching, a lot of pain." After five or 10 minutes,

4.

Toni emerged but she was crying, "very stressed, very afraid" and in "a lot of pain." Toni went directly to the kitchen and grabbed her phone. She did not want to go with EMS personnel because she was afraid. In Officer Vang's 20 years in law enforcement, he had never encountered a juvenile so afraid to get medical or mental help.

Eventually the paramedics were called. When they arrived, Officer Vang explained to Toni that because he heard a recording in which Toni made a "suicidal statement," he would be placing her on a "5150" mental health hold. Toni became angrier. She said she did not want to go because she would "get in trouble." Toni acknowledged making a suicidal statement but told Officer Vang she "didn't mean it."

Toni kept saying, "[H]e's there, he's there." Officer Vang's body camera recorded Toni saying, "[H]e's f[**]king right there." Toni also screamed profanities at her mother for calling the police.

Toni told the paramedics that arrived that she was involved with "prostitution." The paramedics conveyed this information to Eileen. Toni told Eileen that "he" said he would buy Toni whatever she wanted, but she had to "hoe for him." Toni said "he" had brainwashed her. Toni said that "Jonathan" had stolen $80 from her that a family member had given her for shoes.

Paramedics transported Toni to the hospital. Afterwards, Officer Vang drove in the direction where Toni had been looking when she said, "[H]e's there." Officer Vang did not see anyone.

### Toni's Statements at the Hospital

The next day, an officer from the sexual assault unit, Christopher Aranas, met with Toni at the hospital. Toni said that a week prior, she had been walking to the store when she met a "black male adult." The man appeared to be 25 to 35 years of age, had a "light to fair" complexion, and went by the nickname, "Money." Money told her to "work on the street" and go to "the corner and wait for cars to come by." Officer Aranas asked Toni if she was referring to prostitution, and she said yes.

5.

Toni gave $500 she earned from prostitution to Money. Toni had sex with three different men to earn the $500. Toni later said that the sexual contact was not intercourse, but instead involved the men "touch[ing] her private parts." Toni did not want to elaborate.

At trial, Toni testified that she did not remember making many of the statements described by Officer Aranas.

### *Interview of Toni at the Hospital*

Detectives Longoria and Bradford responded to the hospital to see Toni. The detectives told Toni they had seen the prostitution-related text messages on her phone, as well as a video depicting her involved in a sex act.

Toni said that "Jonathan Boyd" was the man with whom she was engaged in the sex act on the video. However, the man in the video was circumcised. Detective Longoria reviewed a different video of Jonathan Boyd having sex with Jessica D., which showed he was uncircumcised. Boyd's penis as depicted in the video involving Jessica was darker than that of the man depicted in Toni's video. The voices of the two men sounded different as well. Detective Longoria testified the man in Toni's video was "dark-complected."

Detective Longoria observed that the prostitution-related messages sent to Toni's phone came from two numbers: (xxx)xxx-9149 and (xxx)xxx-0240.[5] Toni told detectives that the prostitution-related text messages were between her and Boyd. She described Boyd as a "black male, 25 to 30 … light-complected with a mustache." Toni said she told Boyd she was 18 years old. She believed Boyd should not get in trouble because Toni had lied to him about her age.

---

[5] Neither phone number returned a result during a later search of the Fresno Police Department's database.

6.

Toni said Boyd was her boyfriend.**6**  Boyd wanted Toni to "get some money" by "pull[ing] cars over" and turning tricks.**7**  Toni would meet Boyd at "the bridge" because he did not know where his apartment was.  She said she had turned three tricks for Boyd and received $500 total.  Boyd showed Toni some Jordan-branded shoes he had supposedly ordered for her but had not yet given her.

Toni said, "[Y]ou'd do anything for your boyfriend, you know?"  Toni also said she did it "willingly," because she "needs the money too."  When asked about whether Boyd wanted to keep her safe while she was working, Toni said Boyd told her, "If anything, just hit me up, I'll be there in a quick minute."

Toni told detectives that she and Boyd had oral sex "a couple times."  She initially denied having "full sex" with Boyd, but later admitted they did have sex.

Detective Longoria conducted a records search for Jonathan Boyd and found one result that was African-American: defendant.  The records showed defendant's full name is Jonathan Keith Boyd and his date of birth is October 1, 1983.  The record search also showed defendant was on probation at the time.  Detective Longoria contacted defendant's probation officer and asked for defendant's phone number.  The probation officer said defendant's phone number was (xxx)xxx-9149.  Detective Longoria asked the probation officer if he had talked with defendant at that phone number before, and the probation officer confirmed that he had, including as recently as February 16, 2018.

Detective Longoria ran the number (xxx)xxx-9149 through something called the HT Spotlight System.  The HT Spotlight system is a database that collects online

---

**6** At trial, Toni said she did not remember whether she told Detective Longoria that Jonathan was her boyfriend.  She said that she and Jonathan had not talked about being together as a couple.

**7** A transcript of the interview was prepared and offered as an aid to assist the jury as the recording was played.  The parties stipulated that the court reporter need not transcribe the interview audio played for the jury.  While the transcript was not entered into evidence, both parties cite it on appeal, and we will do the same.

advertisements related to prostitution and trafficking. The number (xxx)xxx-9149 was listed as a contact number on several prostitution-related advertisements.

Detective Longoria found advertisements for a "dating" or "escort service" with a picture of victim Jessica D. under the name, "Jasmine."

Another detective searched Facebook with the number (xxx)xxx-0240. The search returned a page under the name "Blue."

Detective Longoria conducted a second interview with Toni, later on the same day as the first interview. Toni told Detective Longoria she did not want to get defendant in trouble. Toni began giving Detective Longoria a description that did not match defendant. Detective Longoria believed she was trying to throw him off, so he would not locate the real suspect. She said the man was a Bulldog Crip gang member. In his 25 years of experience, Detective Longoria had never heard of such a gang and did not believe it truly exists. Toni provided several locations where the man supposedly lived which were in different parts of town. She said the man's name was Jonathan David Boyd, then said the man's first name was David.

Despite having said that she did not know where Jonathan's apartment was, Toni now claimed to have been to one of Jonathan's houses. Toni said that he lived at a specific address on North 9th Street. Detective Longoria conducted a records check and discovered it was actually Toni's own address from a few years prior.

Toni said she had met Jonathan for the first time just a couple days prior to her present interview with Detective Longoria.

Toni now estimated the man was 20 years old, muscular, and had a tattoo of an eyeball on his left hand and a bulldog on his stomach. Toni estimated the man was five feet eight inches or five feet nine inches tall and weighed about 180 pounds.

Detective Longoria obtained three photographs of defendant. All of the photographs were more than three years old, and defendant had "different appearances" in each of them. When Detective Longoria showed the photographs to Toni, she said it

8.

was "not him." Toni repeated the claim several times. However, at one point, when asked again, Toni said, "[N]o comment." She then said, "I'm not gonna tell you."

Toni said Jonathan Boyd's phone number was actually a specific 559 area code number ending in 5690. Detective Longoria called the number and reached a man named David H. David said he had dated Toni before he turned 18. David was an African-American male with dark complexion and stood at 5 feet 6 inches tall and weighed 150 pounds.

### Toni's Statements to Her Mother

Toni's mother, Eileen E., testified about things Toni had told her. Toni said that she did not identify Jonathan Boyd to Detective Longoria because she did not want him to get in trouble. Toni specifically said she lied "about the photo" so he would not get in trouble.

Toni said "he" had a "hoe closet" where they would "get dressed up."[8] Toni said he would buy her whatever she wanted if she made money for him.

### Text Messages on Toni's Phone

Toni consented to Officer Aranas reading text message conversations between her and the suspect. A digital forensic analyst with the police department later extracted text messages on Toni's phone. The analyst created a readout of text messages between Toni's phone and (xxx)xxx-9149. The readout was introduced into evidence as Exhibit 9A.

The prosecution also introduced Exhibit 10, which depicted text messages between Toni's phone and the (xxx)xxx-9149 number. Exhibit 11 depicted text messages between Toni's phone and the (xxx)xxx-0240 number. Toni testified at trial that she remembered some of the text messages but did not remember others.

---

[8] With the word "hoe," Toni was referring to prostitutes.

The text message exchanges between Toni and defendant as reflected in exhibits 9A, 10 and 11 are described in detail below.[9]

On February 18, 2018, Toni received a text message from defendant: "My name is Jonathan Boyd I just got out of prison almost a month ago from doing[] 5 years for pimpin in pandering."[10]  At trial, Toni confirmed that she remembered receiving this text message.

Later that day, defendant said, "I post a lot of shit I got out to nothing lil momma I have to start all over look so I'll know this is u call my phone real quick baby."  The next message said, "I mean I lost a[ ]lot of things material stuff."  Toni testified she did remember receiving a text message from Jonathan saying he had lost a lot of material things while in prison.

Defendant sent Toni a message saying, "I'm not gone [*sic*] play games wit u I know n[*]ggas be on your bumper but I ain't going for baby so I'm letting u know ahead of time that I don't play that s[**]t I don't know what the f[**]k u did to me but I like it."  Immediately thereafter, defendant texted:  "A u can help me get back in the game we gone talk about it later u not on the monitor any more so u can come out rite."  Defendant

---

**9** Exhibits 9A and 10 showed text messages sent between Toni's number and the (xxx)xxx-9149 number.  The prosecution introduced other evidence indicating that the (xxx)xxx-9149 belonged to defendant and that he was the author of these text messages.  Similarly, Exhibit 11 showed text messages sent between Toni's number and the (xxx)xxx-0240 number.  Toni testified at trial that Jonathan Boyd sent her text messages from this number.

Defendant disputes authorship of these text messages.  However, because the inference that defendant authored the text messages from (xxx)xxx-9149 and (xxx)xxx-0240 is supported by substantial evidence and supports the judgment, we will indulge it here.

**10** We have quoted a series of several text messages throughout this opinion.  There are a substantial number of misspellings and grammatical errors in these messages.  However, because their interpretation may be subject to dispute, in part because of these errors, we reproduce them in original form.  Because adding [*sic*] or a similar notation to every error would only add to the confusion, we have omitted it.

then said, "We both like each other," to which Toni responded: "Yead dads but im confused."

Defendant texted: "Look u mine by all means necessary I'm willing to take prison chanses [*sic*] to f[**]k wit u baby I'm not a pimp but I know how the game is I know how to take a female out the struggle of the game u fell in the hands of a boss." Defendant then said, "I'm bout to get up in get dressed OK babe" and then, "Baby girl." Toni responded, "Okay babe but you going to be fine nothing's going to happen I got you baby i won't let nothing happen and don't nobody need to know s[**]t baby." Defendant responded, "OK that's all I needed to hear hit u when I finish getting dressed."

Later, Toni texted defendant: "You sure you don't got a girlfriend because I'm not trying to mess around or nothing like that." Defendant responded, "Let me finish ironing my cloths try in come this way we gone talk about that later its a long story baby." Toni responded, "Oh my God babe." Defendant said, "What u mean u got to hear me out baby series [*sic*] I'll hit u when I'm done OK its not [l]ike that I would stop f[**]king wit anybody for but u need to understand whats going on wit me first in if u willing to do what's needed to be done I'll show u love in everything that comes wit it." Defendant followed up with messages saying, "I promise" and "Baby." Toni replied, "Okay babe it's whatever." Defendant said, "That's what I wonna hear babe hit u in a minute can u meet me on the blade in a couple hours," and "I'll let u know when ok." Toni replied, "Okay baby."

More than an hour later, the following exchange occurred:

> "[Defendant:]   Baby come over here
>
> "[Defendant:]   Baby
>
> "[Defendant:]   Baby
>
> "[Defendant:]   I'm not that one I ain't no sucka pic up the phone or text me back

11.

"]Defendant:]          Baby

"[Defendant:]          OK now I'm getting mad baby girl

"[Defendant:]          I c u

"[Defendant:]          Wya in don't lie

"[Toni:]          I'm sorry baby but where you at and you mad at me or what

"[Toni:]          You over here talking to these b[**]ches why do you care if I talk to these n[**]gas really

"[Defendant:]          Man I was trying to pick u up rite now

"[Defendant:]          U know my phone be trippin"

Later Toni said, "So I'm not going to be able to see you today." Defendant replied, "Yeah I'm on PW" – which Toni understood to refer to Parkway. Defendant followed up, "U by the bridge rite." Toni replied, "No I'm at my house right now." Defendant said, "Come meet me rite now please." Toni responded, "Who with you" and "Baby im sorry." Defendant replied, "Nobody baby I'm not mad at u. I'm trying to teach u something." Defendant continued, "Baby we can do it big" and "When u gone meet me." Toni said, "Tomorrow for sure baby."

The next morning, defendant said, "Baby I really need u today please." He followed up, "Real s[**]t wake yo game up in get me asap babe." Toni responded, "Baby you're not trying to f[**]k with me you trying to f[**]k with those other females out there but it's good I guess I will hit you up no more." Toni continued, "I was really trying to f[**]k with you but I don't want to play no games either *you said you wasn't a pimp I don't know what to believe I don't know if you trying to f[**]k with me or do something else ….*" (Italics added.) Defendant replied, "What the f[**]k man look I won't u I'm already taking chances but I don't pray on innocent woman what ever position u allow me to play that's what im gone play baby On my kids I wouldn't do any harm to u in won't let any one harm or hurt u when your with me."

12.

Defendant later texted Toni asking what size shoes she wore and asked if she wanted "Jordans or Nikes." Toni said she wore a size six, then said: "[B]ut who you on the phone what yesterday when you were laughing baby," "Cuz I had me thinking." Toni followed up, "My phone be messing up I meant who were you on the phone with cuz I was thinking about that." Defendant replied, "Man come talk to me." Toni responded, "Why can't you text it and then I'll go talk to you baby." Defendant said he was "ironing my cloths baby girl."

Later, the following exchange occurred:

"[Toni:]          Where you at baby

"[Defendant:]     Apartment meet me were we first met

"[Toni:]          Baby I'm on Parkway

"[Defendant:]     U get any money baby

"[Defendant:]     Come this way I'll be that way in a minute

"[Toni:]          60

"[Toni:]          Im kn a car babe

"[Toni:]          In

"[Defendant:]     Who car u in

"[Toni:]          Some dude he gonna get me money

"[Defendant:]     Man come this way please

"[Defendant:]     Come this way babe meet me at the bridge

"[Toni:]          Babe he already taking me somewhere

"[Toni:]          When I get out the car Ill go that way babe

"[Defendant:]     Man real s[**]t don't play with me today babe
do what i tell u to do

"[Toni:]          Ok

13.

"[Defendant:]        How long

"[Toni:]        Im trying to tell him to get me momey im not doing nothing with him tho he said he gonna give me 60

"[Toni:]        But like 10 min

"[Defendant:]        Man check this out love get the money

"[Toni:]        Ok babe

"[Toni:]        He over here fingering me."

About eight minutes later, the text conversation continued:

"[Toni:]        Where you at babe

"[Defendant:]        Palm in Belmont

"[Toni:]        Ok ill be right there

"[Defendant:]        Did u get the money love

"[Toni:]        Yea

"[Defendant:]        Ok

More than 20 minutes later, the conversation resumed:

"[Toni:]        So you're not trying to f[**]k with me now

"[Defendant:]        Yup were u at

"[Defendant:]        Do that wit him I'll be their don't go home

"[Defendant:]        Go close to my apartment

"[Toni:]        No cuz you over here playing

"[Defendant:]        Do u hear me

"[Toni:]        I'm getting mad now

"[Defendant:]        I'm on my way I went to get another phone love

"[Defendant:]        N[**]A do what I tell u to

"[Defendant:]        Were the f[**]k u at

14.

"[Defendant:]     Baby girl I see my text answer me now

"[Toni:]     Babe I could have went with you right now but you over here playing talking about you have to go do something WTF

"[Defendant:]     I did have to do something were u at we gone come get u

"[Defendant:]     U suppose to get the money from oh boy babe

"[Toni:]     No I'm good babe

"[Toni:]     I'm mad right now I'm not even in the mood

"[Defendant:]     What the f[**]k baby serious we going to the spot in kick it please

"[Defendant:]     Wya I'll get u rite now

"[Defendant:]     Why u mad babe

"[Defendant:]     Serious wya

"[Toni:]     Cuz I don't believe nothing you say

"[Defendant:]     Don't make me mad love wya

"[Defendant:]     What the f[**]k I don't lie to u love

"[Toni:]     I want to spend time with you but you over here worrying about buls[**]t

"[Toni:]     You don't want to spend time with me

"[Defendant:]     U my baby just trust me

"[Toni:]     Okay now you playing you over here trying to set me up or something trying to get me hurt huh

"[Defendant:]     What the hell

"[Defendant:]     Baby I'm on my way that way

"[Defendant:]     I need u in my life stop in listen to daddy please

"[Toni:]     But I'm not trying to play with you right now

15.

"[Defendant:]        Man were the f[**]k u at

"[Defendant:]        U tripping serious

"[Toni:]        Where are you

"[Defendant:]        Wya at I'm on first in Belmont

"[Defendant:]        Were u at

"[Defendant:]        U not telling me to come get U or what babe

"[Toni:]        I'm all the way over here by my house oh my Lord

"[Defendant:]        Were I'll come get u

"[Defendant:]        By Belmont by the dridge

"[Toni:]        For what babe

"[Defendant:]        We going to the house I chill spend some time together

"[Defendant:]        Don't do me like that

"[Toni:]        Did you get the phone

"[Defendant:]        I'm trying to program it

"[Defendant:]        U acting up

"[Defendant:]        When I tell u to do something do it babe

"[Defendant:]        I won't do u any kind of wrong babe

"[Toni:]        But I don't know if you going to hurt me or not

"[Toni:]        You be confusing me baby

"[Defendant:]        Look wya

"[Toni:]        Baby this dude over here trying to get me

"[Defendant:]        Were the f[**]k u at

"[Defendant:]        A let me program this phone so we can talk

16.

| | |
|---|---|
| "[Toni:] | Belmont and delno |
| "[Toni:] | Okay babe |
| "[Defendant:] | Go towards the bridge |
| "[Defendant:] | Don't leave the bridge please |
| "[Defendant:] | Give me 10 minutes to program this phone love |
| "[Toni:] | What did you go do right now |
| "[Defendant:] | Get this phone |
| "[Toni:] | No you playing |
| "[Defendant:] | in get some trees |
| "[Defendant]: | Man stop n[**]a I don't play games." |

Several hours later, at 7:19 p.m., defendant texted Toni saying, "I need u to catch a date real quick love try to."[11]  Toni replied immediately, "Ok babe."  Defendant said, "So post up by that Mexican restrunt."

Beginning at 5:47 a.m. on February 20, 2018, Toni and defendant had the following text exchange:

| | |
|---|---|
| "[Toni:] | Good morning baby |
| "[Defendant:] school come to daddy | Good morning love a u don't have to go to |
| "[Toni:] | No I got to go to school babe |
| "[Defendant:] serious. | Man I miss u babe I'm having a bad day love |

At 12:25, defendant texted: "Babe u OK."

At 1:23 p.m. on February 20, defendant had a text message exchange with Toni through another of his phone numbers: (xxx)xxx-0240:  "Baby this my other number love

---

[11] Toni initially testified at trial that she knew what "catch a date" meant, then said she did not know what it meant, then said it was too embarrassing to say.

17.

is u ok" and "I hate when u do this s[**]t love answer me."  At 3:07 p.m., Toni and defendant had the following exchange:

"[Toni:]                    Babe i just got out of school

"[Defendant:]         Ok love I miss u

"[Toni:]                    I miss you too

"[Defendant:]         Meet me on the track in a hour

"[Toni:]                    Ok baby."

At 4:55 p.m., the following exchange occurred:

"[Toni:]                    Babe I love you

"[Defendant:]         U love make you're way to this blade love

"[Toni:]                    What babe

"[Defendant:]         Wya

"[Defendant:]         My phone is dieing

"[Toni:]                    Wya

"[Defendant:]         Palm

"[Defendant:]         I just walked to the house cause my phone died.
Come here a it's money out their my love get some on.  Your way here please

"[Defendant:]         Do you here me love

"[Defendant:]         Babevi don't feel good

"[Toni:]                    What's wrong baby

"[Defendant:]         But I'm walking towards the bridge I don't know I feel a little weak

"[Defendant:]         Its good love wya u started walking love

"[Toni:]                    Okay babe I'll be there in 20 minutes

18.

"[Defendant:]        U walking rite

"[Toni:]        Imma start rn babe."

At 6:58 p.m. that night, the following text exchange occurred between Toni and defendant via his (xxx)xxx-9149 number:

"[Defendant:]     Were the f[**]k u at

"[Defendant:]     Were the f[**]k is u

"[Toni:]     Babe I hope you ain't f[**]king nobody

"[Defendant:]     Man fick that I'm on your street

"[Defendant:]     Corner store

"[Toni:]     Ok babe

"[Toni:]     Ill be right there

"[Defendant:]     .yeah b[**]ch u realy got me f[**]ked up upw u woman play these game b[**]ch I'm a real onev

"[Defendant:]     better have some bread when I c u or b[**]ch I'll cop your hair off b[**]ch I'm serious getv."

**Defendant's Arrest**

On March 7, 2018, Detective Longoria met with defendant and his probation officer. Defendant's sister drove him to the probation office. Detectives asked defendant's sister how she got in contact with defendant, and she conveyed the (xxx)xxx-9149 number. When defendant arrived at the probation office, he put his belongings into a bowl so he could go through a metal detector. Among the items he placed in the bowl was a cell phone.

When a detective asked defendant what his phone number was, defendant replied that it was (xxx)xxx-9149. Detectives asked if that was the number to the phone defendant had placed in the bowl, and defendant said it was not. Defendant said he got the phone and SIM card "off the street." But when a detective dialed the number (xxx)xxx-9149, the phone rang.

19.

During the interview, defendant challenged Detective Longoria to tackle him. Defendant told officers something like, "Lock me up or shut the f[**]k up." Defendant was arrested. As defendant was being transported to a patrol car, Detective Anaya was interviewing Jessica. Defendant shouted "Jessica" and told her to "shut up."

Jessica D. gave detectives the passcode to defendant's phone.

**Facebook Posts**

When detectives ran the suspect's phone numbers through a Facebook search, it returned a profile named "Bl Ue." The profile photograph for "Bl Ue" was a picture of defendant. After defendant was arrested, he engaged in several recorded telephone conversations wherein people referred to him as "Blue." An e-mail address associated with the account was the same e-mail address defendant later said was his own on a jail phone call to someone named "Lucky."

The "Bl Ue" Facebook account was "friends" with women named Adrian H. and Brandi M. The HT Spotlight system identified prostitution advertisements for Adrian H. associated with the phone number (xxx)xxx-9149. A detective set up an undercover operation to exchange sex for money with Brandi M.

On November 25, Bl Ue made a Facebook post with the following text:

"There's a lot of obstacles in life we go through on a daily, you got haters, fake hughs, fake smiles … you got those that judge you, people that kick … you when you're down, when you down and out, people that laugh in prey on your downfall. I can name one hundred more, but those that feel what I'm saying know what I'm talking about. They say only the strong survive in I ain't never been weak."

On November 26, Bl Ue made a Facebook post with the following text:

"Shh, 19 days in I'm on everything moving. I just need … one loyal down-to-Earth female who trying to invest the game into some real estate. Get ahead of this sh[*]t before the game take you under boss … because pimping is overrated nowadays."

20.

On November 28, Bl Ue made a Facebook post with the following text:

> "So many Ni[**]as locked up its 10 females to one n[**]ga. I ain't trippin off losing a couple these cats be thirsty now days, but when I knock yours don't cry it's HPM. I got a stomach for it. I can take it. We ain't got to go to way about it, HPM."[12]

Detective Longoria explained that when one pimp takes a prostitute from another pimp, that is called "knocking" her. When a prostitute does not have a pimp, and the pimp takes her for himself, that is called "knocking a hoe."

On November 30, Bl Ue made a post which read, in part, "Now days females fall in love with the money, but if you happen to stumble or take a fall in the game first thing she say is, 'damn, I thought I loved you. HPM." On the same day, Bl Ue posted, "(Prostitution) One who engages in sexual activities for money.) I remember them days, what the f[**]k happen now days a lot of thoughts be out there nowadays just for attention or for the high. I ain't knocking anyone for what they do, but some of you'll need to find a new profession because that one ain't working for you."

On December 1, Bl Ue made a post with the following text:

> "Man food for game if a female go-getter prostitute, hustler or whatever, if she find a boyfriend that won't to boyfriend her that's the position the role she gone play, boyfriend girlfriend, especially if she see he green to that part of the game, she gone today playing that position. I ain't just talking or speaking on something I don't know. I'm speaking off experience. Sometimes that's what it take because from me learning from experience made me sharp on all four corners of the game. I might stumble, but never fumble. Sometimes you got to close the eyes of your heart in open your eyes to the game. AE-sports, HPM."

Detective Longoria explained that playing the position can refer to the process of grooming a prostitute. Detective Longoria also noted that one of the text messages sent to Toni referred to "playing the position."

---

[12] Some stuttering in the recitation of the text has been removed.

On December 15, a day before defendant was released from custody,[13] Bl Ue made a post with the following text:

> "Less than 24 hours so warning if yo hoe acting funny like she ready to run off this is why, she know daddy about to touch down.  Don't hide her in the room how she supposed to make money like that?  What part of the game is that?  You'll had 21 months now I'm on my way in I'm on every hoe that look my way HPM."

Another post from Bl Ue talked about "being a boss or being a pimp or pimping." The term "boss" was also used in a text message from (xxx)xxx-9149 to Toni.  Bl Ue also posted a picture of a man with the letter "P" on his hat.  In human trafficking culture, "P" stands for "pimping" and is often used by pimps.

Another Facebook post indicated Jessica D. "is feeling blessed with Bl Ue." Underneath was a picture of Jessica D. with defendant.  The text for the post was:  "My daddy so sexy.  It's crazy how close we GT to each other."  According to Detective Longoria, the word "daddy" is often used by a prostitute to refer to her pimp.

**Phone Records**

Detective Longoria wrote a search warrant for the cell phones and phone numbers involved in the case.

The IMEI is a number assigned to a particular cell phone.  SIM cards have their own unique number that is different from the IMEI.  Cell records showed that the number (xxx)xxx-9149 was associated with different IMEI numbers over time, meaning the SIM card had been moved between multiple cell phones.[14]

The phone records showed that the (xxx)xxx-9149 number had made/received calls to/from Jessica and Toni within minutes of each other on multiple occasions from

---

[13] Sergeant John Sydow testified that while cell phones are prohibited in jail, he had heard inmates have been found with phones in jail.

[14] In a subsequent jail call, defendant showed he knew how to switch SIM cards between devices.

February 18 through 22, 2018.  The (xxx)xxx-9149 number also received calls from defendant's mother's phone number shortly before or after calls with Toni.

**Events Involving Jessica**

*Text Messages with Jessica*

On March 5, 2018, defendant texted Jessica:  "Pick up."  Jessica responded, "We can talk later right now im bzy" and "U said f[**]k the clothes."  Defendant responded: "B[**]ch im telling u im gone kick that door in i dont givr a f[**]k bout you beibg busy." Later that day, defendant texted:  "Pick up serious."  Jessica responded, "I wont deal with u period.  Cuz as i can see u always tripin off s[**]t tht."  Defendant texted Jessica: "F[**]k yo life u wont even pic up the phone n[**]ga om on yo room in ii ain movin."

On March 6, 2018, defendant texted Jessica:  "Can u tell me car date or mot [*sic*]." Defendant then texted:  "Room."  After a few intervening messages, Jessica texted defendant:  "F[**]k I gt no condoms."  Defendant responded, "What" and then said, "Charge extra."

**Defendant's Jail Calls with His Mother**

In a jail call between defendant and his mother on March 3, 2018, defendant said, "I wasn't doin' no pimpin' "  Defendant said the reason he had been arrested was that he "went off on 'em … in a interrogation room."  Defendant said, "I didn't do it Mama that's a 14-year-old.  I don't even know who that person is."[15]

Defendant's mother asked him, "[H]ow did you pay you bills son up in there?" Defendant replied, "How do I pay my bills?  Jessica."

Defendant claimed to his mother that he had given the code to his phone to detectives because he had nothing to hide.  Defendant claimed law enforcement "did this because" they had tried to "catch" him previously, but they "never could."  So, now, law

---

[15] The transcript of a jail call between defendant and his mother was given to the jury while the call itself was played.  The call was admitted into evidence, but not the transcript.  However, the call as played for the jury was not transcribed by the court reporter, and both parties cite to the transcript.  We will do the same.

enforcement was "coming with this bulls[**]t 'cause I – I don't know no 14-year-old females."

On another call, defendant told his mother he had problems with the Parkside Bulldogs. Defendant said the 14-year-old is supposed to live in the Parkside Bulldog area. Defendant stated, "a lot of Mexicans don't like me because Jessica talks to me. They don't like Jessica because Jessica only talks to blacks." When defendant and Jessica would walk down Belmont "they" used to tell "us" that "you all can't work between the bridge." Jessica responded, "[W]hat do you mean work? I ain't out here ho[e]ing." Defendant recounted that "one time there was an incident where they pushed up on me and then it was the gang – it was – it was ugly."

When asked if defendant thought "the girl" was connected to Bulldogs gang members, defendant said, "Yes she is. She got to be." Defendant claimed that law enforcement had searched his phone, yet found "nothing in there, period."

Defendant acknowledged that he "used to be with known prostitutes."

Defendant's mother told defendant that she had been bringing him money every day. Defendant said that every time she had brought him money, he wrote it down.

Defendant said he would let people use "that phone."

**Defendant's Jail Call With "Lucky"**

Defendant made a jail call to a woman named Lucky, who was apparently the mother of one of his children.[16] Defendant said "they" had "got" him for human trafficking. Defendant claimed "they" had no evidence on him.

Defendant referred to a female – presumably Jessica – who told defendant's lawyer, "I'm the only hoe that he's got."

---

[16] The jury was permitted to review a transcript of a jail call between defendant and Lucky. The call itself was admitted into evidence, but not the transcript. Both parties cite to the transcript on appeal. We will do the same.

Defendant said "[t]he only minor I ever f[**]ked with was my baby mama and that was it." Lucky responded, "I told you how old I was." Defendant said, "Your p[**]sy just gonna trap me." Lucky responded, "But you knew I was a minor before you got that, so shut up." Defendant said, "That was a f[**]kin' …entrapment for real."

Defendant told Lucky she did not have to be single and could "be with me." Defendant said if she moved back to the area, she would have a house. Lucky said she did not want to live with defendant and his hoes. Defendant replied, "My hoes? Don't nobody stay there. My mama don't allow that. *They stay at their apartment*." (Italics added.)

**Defendant's Second Jail Call with Lucky**

Defendant had a second jail call with Lucky later that same day.[17] Defendant said it "dawned" on him that someone had set him up.

Defendant told Lucky to write down his Facebook login information because he needed her to "delete a lot of sh[*]t." He provided his e-mail address: j_money400@yahoo.com and provided a password. He told her to "erase everything" including posts and messages.

On the call, defendant referred to Jessica D. as his "main b[**]ch."

**Defendant's Jail Calls with Jessica**

Every inmate in the Fresno County Jail is given a jail identification number. Inmates must use their identification number to place phone calls. Sometimes, inmates use the identification number of another inmate to avoid detection by law enforcement. Law enforcement has caught people doing this through voice recognition and call content.

---

[17] The jury was permitted to review a transcript of the second jail call between defendant and Lucky. The call itself was admitted into evidence, but not the transcript. Both parties cite to the transcript on appeal. We will do the same.

On April 22, 2018, defendant called Jessica from jail using another inmate's identification number. Defendant told Jessica they would always be together.

Defendant said a person named Brandy had told him, "that b[**]ch set you up." Brandy said she saw a "little b[**]ch" come out of "her room in the Californias."[18] Jessica denied that anyone came out of the room. She then said that if anyone came out, "it was a trick."[19]

In another jail call, Jessica described the crime of pandering to defendant. Defendant said, "[T]he victim's not coming to court against me."

During their calls together, Jessica repeatedly referred to defendant as "Blue" and "Daddy."

**August 12, 2016, Jail Call**

On August 12, 2016, an inmate called Jessica.[20] The jail identification number used for the call belonged to one Robert Harris. Defendant and Robert Harris had similar-sounding voices.

When asked where she was, Jessica said she was driving down "the two-way" because she wanted to "get that $100 from him." The inmate told Jessica she needed to "pick and choose" and when she "run[s] across a good one … try to make that motherf[**]ker your regular." The inmate told Jessica to get two or three regulars and she would be all right.

The inmate said that when he got out, he could get her two more phones, and she could "post like three ads on each phone and I'll just help answer the phone." According

---

[18] Jessica's subsequent denial suggests the "her" in this statement was Jessica.

[19] According to Detective Longoria, a "trick" is a person who pays for sex.

[20] Initially, Detective Longoria identified the inmate as defendant. However, Detective Longoria came to question whether the inmate was defendant because the inmate repeatedly said, "[Y]ou know what I mean, you know what I'm saying." Defendant did not use that phrasing often.

Because the identity of the inmate who called Jessica in the August 12, 2016, call is unknown, we will refer to that speaker simply as "the inmate."

to the inmate, once the ads were posted, her phones could ring often.  The inmate suggested they might have to leave "this" side of town and go north near River Park and "get a room."

The inmate said he did not want Jessica "walking."  The next time she was "walking" on that "track," he wanted to be with her.  The inmate wanted Jessica to make the "track" miss her.

At the end of the call, the inmate and Jessica each said they loved the other.

**Inmate Account Deposit**

Jessica made deposits into defendant's account, which he could use to buy things while in custody.

**Toni Does Not Identify Defendant at Trial**

At the outset of Toni's trial testimony, the prosecutor observed Toni was trembling.  Toni confirmed she was nervous and had a support person in the courtroom nearby.

Toni was asked whether the man she had referred to as Jonathan Boyd was present in the courtroom.  Toni replied, "I don't know."  She repeated that answer several times.

**Prosecution Expert Rebecca Bender**

The prosecution called Rebecca Bender as an expert on human trafficking.  Bender herself had been a victim of sex trafficking for nearly six years.

Bender explained that there are various types of pimps, including Romeo pimps and guerilla pimps.  Romeo pimps pretend to be your boyfriend.  Guerilla pimps use force, fraud, and coercion to control their victims.  Bender explained that the "track" or the "blade" is the place where victims are supposed to prostitute.

In her experience working with hundreds of survivors of trafficking, Bender knows that victims often mistrust law enforcement.  There is also a fear of retaliation if you "snitch."  Often, victims do not realize they are being trafficked and instead they think they are in a relationship with someone who hurts them.

27.

Traffickers often follow a pattern in obtaining victims: "[T]hey date them, they groom them, they turn them out and break them." Grooming involves pushing the victim's boundaries further and further. Example of "breaking" would include threatening or beating the victim, tattooing the trafficker's name on her body, or even having the victim's hair cut off. "Turning out" means selling a victim for sex.

Often, victims have a physical opportunity to escape, but they decline to do so because they have been brainwashed. In addition to mistreating victims, traffickers will sometimes give them rewards such as shopping or vacations.

Most pimps have multiple girls, with the goal "to get as many in the stable as you can." Some pimps will have their "girls" all live together. Other pimps will keep the girls secret from one another so they can get them to believe she is the only one he loves.

Traffickers often use multiple cell phones to facilitate their misconduct. Traffickers often threaten their victims through text messages.[21]

**Law Enforcement Testimony**

Sergeant John Sydow testified traffickers could exert control over victims through jail calls. Some traffickers only use a nickname, while others use their real name. If the trafficker uses a nickname, his prostitutes may or may not know his real name.

Detective Longoria testified that a pimp will often require "his females" to refer to him as "daddy."

Defendant had multiple tattoos, including one that says "Money" on his left arm.

## DISCUSSION

### I. Substantial Evidence Supports the Finding that Defendant was the Perpetrator of Counts 1, 2, and 4

Defendant contends there was insufficient evidence showing he was the perpetrator of counts 1, 2, and 4. Defendant argues there was inadequate evidence that he was the Jonathan Boyd to which Toni referred in her statements.

---

[21] Sergeant John Sydow and Detective Longoria offered similar testimony.

When considering a substantial evidence challenge, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains … evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.)

" ' "[I]t is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 625–626.) In contrast to the jury – which must acquit if it finds the circumstantial evidence susceptible to two reasonable interpretations, one of which suggests guilt and the other innocence – an appellate court *must* accept logical inferences in *favor* of the judgment if supported by the circumstantial evidence. (*Ibid.*) Thus, " '[w]here the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' " (*Id.* at p. 626.)

As explained below, there was clearly substantial evidence that defendant was the "Jonathan Boyd" who trafficked Toni. Defendant does point to other evidence in his favor on the issue of identity. However, at most, defendant has shown that the circumstances might also be reasonably reconciled with a finding contrary to the one made by the jury – a showing that does not warrant reversal.

The Facebook account "Bl Ue" had a profile picture of defendant, a name (i.e., Blue) that matched defendant's moniker, and was associated with an e-mail address defendant identified as his own. The Facebook account clearly conveyed involvement with pimping and prostitution. Moreover, defendant said in a jail call that he "used to be with known prostitutes." This all raises an inference that defendant was involved in pimping generally.

Toni said her trafficker was named Jonathan Boyd and went by the moniker, "Money." Substantial evidence supported an inference that defendant went by the

29.

moniker "Money." First, he had a tattoo of the word "Money." Second, his e-mail address is j_money400@yahoo.com. A finder of fact may consider identity of name in determining whether evidence refers to the particular defendant before the court. (See *People v. Garcia* (1970) 4 Cal.App.3d 904, 911; *People v. Luckett* (1969) 1 Cal.App.3d 248, 253; see also *People v. Hill* (1967) 67 Cal.2d 105, 121.) Here, there are *two* nominal connections to defendant – his actual name and his moniker. It is highly unlikely that there is any other Jonathan Boyd that also goes by the moniker "Money" in the Fresno area. Certainly, it is unlikely enough that the identity of name and moniker at least supports an inference that Toni was referring to defendant when she spoke of Jonathan Boyd a.k.a. "Money."

Moreover, several incriminating text messages were sent from defendant's cell phone number to Toni's cell phone. Defendant acknowledges the phone numbers used to text Toni were traced back to him. Nonetheless, he claims it was never "established" that he authored the texts and, therefore, the evidence merely raises a "strong suspicion." However, evidence need not conclusively *establish* his authorship, it need only support an *inference* of authorship in order to be germane on substantial evidence review. Here, not only was there significant evidence that (xxx)xxx-9149 was indeed defendant's number, there was also evidence that calls were placed from that number to defendant's mother in close proximity to contact with Toni's cell phone number. Taken together, the cell phone evidence raises a strong inference that defendant was the actual author of the incriminating text messages sent from the (xxx)xxx-9149 number.

Against this evidence of guilt, defendant points to favorable statements and testimony Toni gave, arguing they constitute "substantial evidence" that he was not her trafficker. However, the fact that a defendant's position may be supported by substantial evidence is immaterial on review of the sufficiency of evidence. What defendant needed to show was not that *his* urged inference *was* supported by substantial evidence, but that the factual findings underlying the *judgment* were *not* supported by substantial evidence.

So long as the judgment is supported by substantial evidence, the fact that contrary findings were also supported by substantial evidence is irrelevant. Put differently, " '[w]here the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' " (*People v. Clark*, *supra*, 63 Cal.4th at p. 626.)

Even if the strength of the evidence cited by defendant were material, we observe the evidence is not particularly compelling when viewed in context. As defendant notes, Toni did make some statements indicating defendant was not her trafficker. For example, Detective Longoria showed her photographs of defendant, and she denied he was her trafficker. However, she later told her mother that she had lied to Longoria "about the photo" because she did not want defendant to get in trouble. As a whole, this evidence actually supports an inference defendant was indeed her trafficker.

Defendant argues that when Toni told her mother she lied to protect Jonathan Boyd, she was referring to an "imposter" Jonathan Boyd, not defendant. Defendant also contends that Toni's admission to her mother she had lied to Detective Longoria does not "supply affirmative evidence that identifies him as the perpetrator." However, these arguments are meritless, because the photographs Toni rejected were of defendant, and Toni specifically said she had lied to Detective Longoria *about the photographs*. If Toni was lying when she said the photographs of defendant did not depict her trafficker, then that means the photographs *did* depict her trafficker. How else could the original rejection of the photographs have been a lie? Thus, Toni's admission of lying about the photographs *affirmatively* implicates defendant, and it does so through physical appearance, not name.

As defendant notes, Toni also said that the man in the sex-act video on her phone was Jonathan Boyd, and that his middle name was "David." Additionally, some of Toni's various physical descriptions of her trafficker did not match defendant. And, at

31.

trial, Toni was asked whether the man she had referred to as Jonathan Boyd was present in the courtroom. Toni replied, "I don't know." She repeated that answer several times.

These portions of Toni's statements and testimony on which defendant relies, while helpful to the defense, do not negate the evidence in support of the judgment. Recall that because of Toni's inconsistent statements during interviews, Detective Longoria believed she had been trying to throw him off, so he would not locate the real suspect. Toni herself said she had been trying to protect Jonathan. Experts testified that trafficked girls often feel attached to their traffickers and mistrust law enforcement. Thus, there is a compelling explanation for Toni's testimony and statements apart from defendant's innocence. It was for the jury to either accept these aspects of Toni's testimony as truthful or reject them as part of an effort to protect defendant.

It is important to remember that juries can accept portions of a witness's testimony while rejecting other portions of the same witness's testimony. (See *People v. Neal* (1960) 181 Cal.App.2d 304, 307.) " '[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.' " (*Ibid.*) Here, the jury could have accepted Toni's testimony that her trafficker was named Jonathan Boyd a.k.a. "Money." At the same time, the jury may have concluded that Toni was trying to protect defendant and, therefore, rejected her testimony and statements suggesting defendant was not the Jonathan Boyd she knew.

Defendant next observes that it would be oddly careless for a trafficker to identify himself by name in a text message to his victim. As a result, he argues the text message to Toni from his phone number saying, "My name is Jonathan Boyd I just got out of prison almost a month ago from doing. 5 years for pimpin in pandering," is evidence of an imposter. This particular text message does seem notably careless and peculiarly phrased. It is not inconsistent with someone pretending to be defendant. But neither is it

wholly inconsistent with the possibility that defendant was simply being careless. It is notable that the text message in question uses "in" to apparently mean "and," – diction that appears throughout defendant's text messages to Toni. Moreover, defendant demonstrated apparent carelessness in other contexts, including telling someone to delete his Facebook data – which had incriminating references to pimping – over a recorded jail call. Defendant also had text message exchanges with Toni and Jessica that were thinly veiled references to prostitution and were hardly conveyed in some sophisticated, indecipherable code. In sum, defendant sending a careless text with his actual name remains entirely plausible. And when viewed in light of the other evidence implicating defendant, his authorship moves from plausible to something far more likely. In any event, the fact that some evidence could be reconciled with a contrary finding does not warrant reversal of the judgment.

## II. Substantial Evidence Supports the Jury's Verdict on Count 3

Defendant argues that even if there was substantial evidence showing he was Toni's trafficker, there is insufficient evidence that he had lewd contact with her as alleged in count 3.

The prosecutor argued to the jury that Toni told Detective Longoria at the hospital that she and Jonathan Boyd had sex. Toni then "kind of pulled back and said it wasn't full sex" but rather was "just oral copulation."

The prosecutor specifically argued the evidence showed Toni had sexual contact with the man on the video *and* with defendant:

> "[A]nd we would expect because of that video of her with a *different* individual, that Defense would say, well, no, she didn't have sex with Jonathan Boyd, she had sex with this other person. But she *also* had sex with Jonathan Boyd. That was … the basis for this count."

Toni also told Detective Longoria that she and Boyd had sex once at his "ho room."

Defendant argues that while Toni admitted having sex with Jonathan Boyd, her statement that the man on her phone video was "him" means it is clear Toni *only* had sex with someone other than defendant. This contention ignores that the jury was free to accept Toni's statement that she had sex with Jonathan Boyd, while rejecting her statement that the man on her phone video was Jonathan Boyd, and instead accepting other evidence showing defendant was indeed the Jonathan Boyd she referenced. (See *People v. Neal*, *supra,* 181 Cal.App.2d at p. 307.) The jury had plenty of grounds to reject Toni's statement that the man on the video was Jonathan Boyd, including Detective Longoria's testimony that it seemed Toni was trying to throw him off and Toni's mother's statement that Toni admitted lying to Detective Longoria during the interview. Consequently, we will not disturb the jury's verdict on count 3.

## III. Substantial Evidence Supported the Jury's Special Circumstance Finding as to Count 1

Defendant next challenges the sufficiency of the evidence to support the special circumstances allegations attached to count 1.

Human trafficking in violation of section 236.1, subdivision (c), without more, is subject to five, eight or 12 years in prison. (§ 236.1, subd. (c)(1).) However, "when the offense involves force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person," then the punishment is 15 years to life. (*Id*. at subd. (c)(2).) Defendant argues there was insufficient evidence to establish the special circumstance under subdivision (c)(2).

As explained below, there was substantial evidence of the following chain of inferences: (1) Toni feared a specific male who wanted her to be at a specific location on February 20, 2018; (2) that male was defendant; and (3) Toni's fear was related to defendant's demands that Toni prostitute herself.

First, the events of February 20, 2018, clearly showed Toni feared a specific male who wanted her to go to a particular location. Toni insisted to her mother, Eileen, that

she did not want to "go anywhere." Eileen reassured her that she was not going anywhere. Toni said, "But if I don't go … he says he's going to kill me…." Eileen described Toni as "literally going crazy," so she called police. Before the police arrived, Toni said she wanted to kill herself. Toni said, "[T]hey're going to kill me anyways." Toni said that she had to go to the corner store, and if she was not there, "he's going to shoot me."

Toni was "very stressed, very afraid." After emerging from the bathroom, Toni went directly to the kitchen and grabbed her phone. She did not want to go with EMS personnel because she was afraid. In Officer Vang's 20 years in law enforcement, he had never encountered a juvenile so afraid to get medical or mental help. Toni said she did not want to go to a hospital because she would "get in trouble." Toni kept saying, "[H]e's there, he's there." Officer Vang's body camera recorded Toni saying, "[H]e's f[**]king right there."

This evidence clearly supports an inference Toni feared a particular male who required that she go to "the corner store," or he would shoot her.

Second, there was substantial evidence that the male Toni feared on February 20, 2018, was defendant. Just before 7:00 p.m., defendant texted Toni saying, "Where the f[**]k you at?" and "Where the f[**]k is you?"[22] Toni responded that she hoped defendant was not having relations with other people. Defendant replied, "Man fick that I'm on your street;" "Corner store." At around 8:17 p.m., Toni's phone received the following messages: "yeah b[**]ch u realy got me f[**]ked up upw u woman play these game b[**]ch I'm a real onev"; "better have some bread when I c u or b[**]ch I'll chop your hair off bitch I'm serious getv."[23]

---

[22] For reference, Officer Vang was dispatched to Toni's residence at around 8:00 p.m.

[23] Defendant suggests the text messages only show a desire to get money from Toni, not necessarily a desire that she prostitute herself. But defendant specifically told Toni to meet him at the "track" and the "blade." Those terms are specifically tied to

The timing and defendant's reference to the corner store, strongly support the inference that the man Toni feared that night was defendant.

Third, there was substantial evidence from which the jury could infer the fear defendant instilled in Toni was related to his attempts to traffic her as a prostitute. Defendant had been asking Toni to meet him throughout the entire day of February 20. At one point, defendant referenced the place he wanted Toni to meet him as "the track" and "the blade" – which raises an inference he was expecting her to come and prostitute herself. An expert testified the "track" or the "blade" is the place where victims are supposed to prostitute themselves. At around 3:00 p.m. that day, defendant texted Toni saying, "Meet me on the track in an hour." Toni replied, "Ok baby." Shortly before 5:00 p.m., defendant texted Toni saying, "U love make you're way to this blade love."

Defendant insists that the evidence showed he wanted to meet her so she could give him bread, which would not be inducement to commit a commercial sex act. However, defendant had told Toni he wanted to meet her on the "blade" or "track" throughout that day. This terminology is connected with prostitution activity. Later, defendant said he was on her street, "corner store." Toni said she would "be right there," but it seems clear she never made it to the corner store that night. It was over an hour later when defendant sent the text message saying, "better have some bread when I c u or b[**]ch I'll chop your hair off b[**]ch I'm serious…." Given the prior communications about defendant's desire to meet with Toni (at the "blade" or the "track"), and defendant's communication that she "better have" some bread the next time defendant saw her, the jury could have reasonably inferred that defendant initially wanted to meet with Toni to facilitate acts of prostitution and, once he realized she was not coming,

---

prostituting, whereas a money exchange could happen anywhere. In any event, defendant has merely identified an inference he wished the jury had made. That does not mean the jury could not make a different inference.

conveyed a threat that she better have engaged in money-generating acts of prostitution by the next time he saw her.

Defendant notes that during her interview with Detective Longoria, Toni said, "I do it willingly. Because I feel like, you know, I need the money too … you'd do anything for your boyfriend, you know?" But the jury was free to reject this statement as Toni attempting to, yet again, protect defendant. Because the jury's finding on the section 236.1, subdivision (c)(2) issue was supported by substantial evidence, it is immaterial that there is also evidence that could be reconciled with a contrary finding.

Defendant argues that because the prosecutor tied the special circumstance to defendant's text message referencing "bread," that is the theory that must be reviewed for substantial evidence. First, we observe that this text message *is* part of the substantial evidence supporting the special circumstance.

Second, defendant's legal premise is incorrect. The jury is not limited to the prosecution's stated factual theory. (*People v. Leonard* (2014) 228 Cal.App.4th 465; see *People v. Perez* (1992) 2 Cal.4th 1117, 1125–1126; *People v. Manson* (1976) 61 Cal.App.3d 102, 207.) Defendant resists this conclusion, citing to *People v. Brown* (2017) 11 Cal.App.5th 332.[24] *Brown* observed that when the constitutional right to jury unanimity is implicated, the court must instruct on unanimity or the prosecutor " ' "must elect the specific act relied upon." ' " (*Id.* at p. 341.) Thus, *Brown* held that "when the prosecution has made an election, *under circumstances where a unanimity instruction would otherwise have been required*, then [the appellate court is also] bound by that election." (*Ibid.*, italics added.) No unanimity issue has been raised here. And even *Brown* itself acknowledges the general rule that " 'the prosecutor's argument is not

_____

**24** Defendant also cites *People v. Graff* (2009) 170 Cal.App.4th 345 for the proposition that sufficiency of the evidence should be reviewed based on the *actus reus* identified by the prosecutor at trial. *Graff* does not support that proposition. *Graff* reversed a judgment because the defendant was prosecuted for charges not shown by the evidence adduced by the prosecutor at the preliminary hearing. It is inapposite.

evidence and the theories suggested are not the exclusive theories that may be considered by the jury.' " (*Ibid.*)

In sum, there was evidence for the jury to infer that defendant wanted Toni to come to the "blade" or the "track" to work for him as a prostitute as she had done in the past, and that Toni believed she had to go to their meeting spot or defendant would shoot her. These inferences support a jury finding that defendant's trafficking offense "involved" fear (and also likely coercion, duress, menace or threat of unlawful injury). (See § 236.1, subd. (c)(2).) We therefore reject defendant's claim.

## IV. Incorrect Wording of Instruction on the Special Circumstance Allegation on Count 1 was Harmless

The jury found that the allegation in count 1 "involved force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury" was true. Defendant seeks reversal because while the jury expressly found count 1 "involved" force fear, fraud, etc., the instructions did not clearly or expressly require such a finding. We hold that, in light of the jury's clear and correctly worded finding, any omission of that wording in the instruction was harmless.

Human trafficking is subject to enhanced penalties "when the offense involves force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person." (§ 236.1, subd. (c)(2).) Here, the jury found that defendant's trafficking of Toni "involved" force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury as required by the statute. Nonetheless, defendant seeks reversal because the court's instruction did not make clear the jury was to determine whether the offense "involved" the requisite circumstances.

The court instructed the jury, "If you find the Defendant guilty of the crime charged in Count One, you must then decide whether the People have proved the additional allegation that the Defendant used force, fear, coercion, violence, duress, or menace to Toni B."

Defendant contends, and the Attorney General agrees, the court's instruction is grammatically incorrect insofar as it refers to defendant using force, fear, etc. "to" Toni B. The Attorney General acknowledges the instruction should have used "on" instead of "to." Or, it should have included "threat of unlawful injury" before "to Toni B." Defendant also argues the instruction failed to require that the trafficking "involve" force, fear, etc. The Attorney General argues harmlessness. We conclude the error was harmless beyond a reasonable doubt.

First and foremost, we note that while the instruction did not expressly require it, the jury nonetheless expressly found that count 1 "*involved* force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury." (Italics added.) This was the finding required by the statutory language.[25] (See *People v. Luna*, *supra*, 209 Cal.App.4th at p. 468.)

Second, in considering the effect of an erroneous instruction, we look at several factors including whether the prosecutor correctly explained the relevant law in closing argument. (See, e.g. *People v. Kelly* (1992) 1 Cal.4th 495, 526.) While discussing count 1 (human trafficking of Toni B.), the prosecutor argued: "The further allegation is important because it alleges that *when the Defendant committed this crime, he used* fear, force, coercion, violence or, um – or duress." (Italics added.) Thus, the prosecutor tied the use of fear, force, etc. to the commission of the human trafficking count.

Defendant says the prosecutor's argument exacerbated the instructional issue by relying on defendant's text message to Toni telling her she "better have some bread" and arguing the offense involved duress. Defendant says this may constitute coercion for Toni to turn over previously earned prostitution money, but "it did not coerce her to engage in prostitution." We do not agree that defendant's inference is the only

---

[25] Defendant argues that a correctly worded verdict form does not "cure" an erroneous instruction. However, a correctly worded verdict form is germane to the prejudice inquiry. (See *People v. Luna* (2012) 209 Cal.App.4th 460, 468.)

39.

reasonable one.  The defendant told Toni she better have some "bread" "*when I see you or I'll chop off your hair b[**]ch I'm serious.*"  Given that defendant had been trying to get Toni to come to the "track or the "blade" that entire day, and the apparent fact that Toni never showed up, the jury could conclude that defendant was trying to get her to engage in acts of prostitution, and when she failed to do so, he was making clear that, sometime in the *future* but *before the next time he saw her*, Toni was expected to earn money through prostitution and provide the proceeds to him.  Therefore, in light of the prosecutor's correct statement of the law described in the preceding paragraph, and the fact that multiple inferences could be drawn from the prosecutor's reliance on this text message in closing argument, this aspect of the prosecutor's argument does not preclude a finding of harmlessness.

Third, in reviewing prejudice, we also look to the context of the challenged instruction.  Here, the court's instruction tied the special circumstance allegation to count 1:  "If you find the Defendant guilty of the *crime charged in Count One,* you must *then* decide whether the People have proved the *additional* allegation that the Defendant used force, fear, coercion, violence, duress, or menace to Toni B."  (Italics added.)  Thus, while the instruction should have been clearer on the point, it seems likely any reasonable juror would have understood the use of force, fear, etc. needed to be connected to count 1.  With this particular jury, we do not even need to speak in probabilities on that point because the jury clearly *did* find that the crime of trafficking Toni "involved" force, fear, etc. – exactly what is required by statute.

We find the error harmless beyond a reasonable doubt.

**V.      Any Error in Instructing Jury That It Did Not Matter Whether Toni Was Already a Prostitute is Harmless**

On count 4 (pandering a minor – Toni), the court instructed the jury that, "It does not matter whether Toni B. was a prostitute already."[26]  The Attorney General notes that defendant failed to object below, and that failing to object forfeits any challenge to an instruction that was correct in the law.  Defendant argues the instructions was not correct in the law.  We do not address error or forfeiture because we conclude any error was harmless as to count 4.

Whether the instruction was erroneous is a close call.  It is important to note that, in isolation, the instruction that "It does not matter whether Toni B. was a prostitute already" is overly broad and misleading.  While the fact that Toni B. was or was not a prostitute "already" was not *dispositive* as to the crime of pandering (*People v. Zambia* (2011) 51 Cal.4th 965, 977), that does not mean it was *irrelevant* to the crime of pandering.

However, instructions are not to be viewed in isolation.  The question is whether this instruction, in light of all the others, was likely to mislead the jury.  It is important to note that the challenged instruction came immediately after the elements of the crime of pandering.  Thus, it is possible the jury would have understood it as identifying something that is not *an element* of pandering (i.e., that Toni B. had not been a prostitute before defendant's actus reus).  In other words, the jury could have understood "does not matter" to be synonymous with "is not required" rather than "is completely irrelevant."  The former understanding would have been consistent with the law.  However, "does not matter" is a broader phrase than "is not required."  Thus, rather than resolve this matter on the closer issue of error, we will turn to prejudice.

At worst, the instruction told jurors not to consider relevant evidence (i.e., whether Toni "was a prostitute already.")  There is no reason such a claim of error should be

---

[26] The court gave a similar instruction on count 9 (pandering Jessica).  We reverse defendant's conviction on count 9 on other grounds.

41.

reviewed under a stricter prejudice standard than the one applicable to erroneous exclusion of relevant defense evidence. The two situations are of similar effect and, if anything, exclusion of defense evidence is worse for a defendant than telling the jury not to consider defense evidence that has been admitted. Thus, we will ask whether it is "reasonably probable" the evidence excluded from the jury's consideration would have affected the outcome. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1115–1116, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151; see also *People v. Anderson* (2012) 208 Cal.App.4th 851, 886–887.)

Defendant argues there was evidence Toni was an existing prostitute when she met "Jonathan." We disagree.

Toni told Detective Longoria that "this is the first time I ever did this" – referring to prostitution.

Later in the interview, the following exchange occurred:

"Detective Longoria:     Okay, did he tell you what you had to do when you went out to ho?

"Toni:     Um-

"Detective Longoria:     How did you know about that since it was your first time? He told you?

"Toni:     'Cause my sister used to do it before.

"Detective Longoria:     Your sister used to be a prostitute?

"Toni:     Yes."

When Detective Longoria asked how much she charged for sex, Toni said it depended on how the person looks and sounds and whether he has a condom.

These statements, defendant argues, "implied that [Toni] was an existing prostitute." We disagree. In his question, Detective Longoria reiterated what Toni had told him – that this was her first experience with prostitution. Toni explained that her sister used to be a prostitute, but that statement does not even raise an inference that Toni

42.

was herself a prostitute. And, without expert evidence, defendant cannot show that the fact that Toni charged for sex based on how a person "looks and sounds" and whether they had a condom was particularly sophisticated so as to raise an inference of prior prostitution experience.

Defendant notes that Toni provided amounts she had charged for sex but had also said she only allowed "tricks" to "finger" her. However, this does not raise an inference as to whether Toni had "been in engaged in prostitution for some time."

Thus, we do not agree that a reasonable juror could infer that Toni was an experienced prostitute when she met Jonathan. We conclude there is no reasonable probability defendant would have obtained a more favorable outcome on count 4 in the absence of the challenged instruction. For the same reason, we conclude any error was harmless as to count 1, because, at most,[27] it was dependent on the validity of the conviction on count 4.

## VI. Substantial Evidence Supported the Jury's Verdict on Count 8

Defendant argues there is insufficient evidence to support count 8.

Section 266h, subdivision (a) makes it a crime to, among other things, live or derive support or maintenance in whole or in part from the earnings or proceeds of a known prostitute's prostitution. Consequently, an essential element of the crime with which defendant was charged is that " 'the money acquired [came] from the earnings of the illicit … [prostitution], and [was] used toward the recipient's support or maintenance.' " (*People v. Grant* (2011) 195 Cal.App.4th 107, 115.)

There was clearly sufficient evidence for the jury to conclude that Jessica worked as a prostitute, that defendant was aware of her prostitution, and that Jessica provided at least some support to him through helping him pay bills and depositing money on his

---

[27] Count 1 could have been predicated on count 2 as well.

43.

account in jail.**28**  However, defendant argues there was insufficient evidence that the support he received from Jessica came from the "earnings or proceeds" of her prostitution.  We disagree.

In *People v. Scally* (2015) 243 Cal.App.4th 285, a defendant charged with pimping claimed he was merely an innocent bystander to the acts of prostitution engaged in by his "girlfriend."  However, evidence showed the defendant had instructed his girlfriend to continue prostituting until she met a certain quota.  (*People v Scally*, at p. 294.)  The *Scally* court held "a jury could conclude that, as a matter of common sense, when [the] defendant was instructing [her] to meet certain quotas, he was doing so for his own gain." (*Id.* at p. 293.)  In other words, a defendant's efforts to have a prostitute obtain more money raises an inference that he had an arrangement under which he was personally benefitting from the earnings of said prostitution.

In the present case, when Jessica told defendant she had no condoms for a "date," defendant told her to "charge more."  The jury could conclude the defendant gave this directive to Jessica because he would personally benefit from an increase in Jessica's prostitution-related income.**29**  Given that inference, the jury could further infer that Jessica's helping defendant pay his bills and depositing money on his account were done in accordance with that arrangement.**30**

Much like the defendant in *Scally* who claimed he was an innocent bystander to his girlfriend's prostitution, defendant in the present case suggests his statement, "charge

---

**28** Recall that when defendant's mother asked him how he paid his bills, defendant responded:  "How do I pay my bills?  Jessica."

**29** Much like the defendant in *Scally* who claimed he was an innocent bystander to his girlfriend's prostitution, defendant in the present case suggests his statement, "charge more," was "[m]ere advice."  But merely identifying a different inference the jury could have drawn does not warrant reversal.

**30** Defendant's insistence that the prosecution must either trace the specific funds to prostitution or prove that prostitution was the only source of the prostitute's income is not supported by the statute or cases like *Scally*.

more," was "[m]ere advice." But merely identifying a different inference the jury could have drawn does not warrant reversal. Given the evidence defendant was personally involved in pimping generally, and that Jessica was both a prostitute and defendant's girlfriend, it was quite reasonable for the jury to infer "as a matter of common sense" that defendant's statement was more than disinterested advice.

Defendant acknowledges the jail call where he identifies Jessica as a means by which he paid his bills. However, he contends that there was no evidence he actually had bills, and there was no evidence that Jessica paid any such bills. But the statement itself is the evidence. When defendant was asked how he pays his bills, he did not say, "I have no bills." Instead, he said, "How do I pay my bills? Jessica." A clear inference from that statement is that defendant has bills and pays them with money obtained from Jessica. Defendant having his bills paid with money obtained from Jessica is the actus reus of the crime.

Defendant suggests that because he was in jail, any bills paid with Jessica's money did not go toward "support[ing]" him. He argues the jail provided his support and maintenance. However, the fact that the jail provided defendant with shelter and food – and arguably other forms of support – does not negate the fact that providing the means for defendant to pay his bills is also a form of "support."

## VII. Defendant Has Not Established That the Court's Instructions on Pimping Were Erroneous

Defendant next contends that the instructions on the offense of pimping erroneously the omitted mens rea and actus reus elements of that crime.

### Background

The relevant portion of the pimping statute applies to "any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution." (§ 266h, subd. (a).) The court's instruction on count 8 (pimping of Jessica D.) provided, in pertinent part: "the

45.

People must prove that; one, the Defendant knew that Jessica D. was a prostitute; and [¶] two, the money or proceeds that Jessica D. earned as a prostitute supported the Defendant in whole or in part."[31]

### Analysis

The court's instruction tracks closely with the elements set forth in the pimping statute. The statute applies to any person who "know[s] another person is a prostitute" and the instruction required the People prove defendant "knew Jessica D. was a prostitute." The statute applies to such persons who "live[] or derive[] support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution," and the instruction required the People to prove "the money or proceeds that Jessica D. earned as a prostitute supported the Defendant in whole or in part." The instruction clearly conveyed the applicable requirements of the statute.

#### Actus Reus

Nonetheless, defendant contends the instruction was insufficient. He argues that there is a significant difference between the statute's reference to "deriv[ing] support" from prostitution earnings and the instruction's reference to being "supported" by prostitution earnings. He observes that the statute requires the defendant have engaged in the verbs of living or deriving support. In contrast, the instruction is phrased such that the "money or proceeds" is engaged in the verb of "support[ing.]" Thus, the court's instruction would provide for criminal liability even where the defendant is entirely passive. We disagree.

Regardless of the different grammatical structures employed, the instruction conveys that a defendant must be "supported" by the prostitution earnings. As a matter of common English usage, this phrasing suggests some participation by defendant, and would preclude mere passive receipt of prostitution earnings without subsequent use or

---

[31] The instruction on count 2 (pimping Toni) used the same language and added the third element that Toni was under the age of 16 when she engaged in the prostitution.

46.

deployment of said funds by the defendant. For example, it would clearly not suffice under the court's instruction if a known prostitute handed a defendant an envelope of cash earned from prostitution; yet the defendant never spent or used it in any way. No one would say the defendant was "supported" by the prostitution earnings in that circumstance. That is because the idea of being "supported" by particular funds inherently conveys some measure of knowing involvement by the person being supported.

Defendant notes it would be unreasonable to make it a crime for a child to derive support from a parent who is a prostitute. We agree. But it would not solve this conundrum to mandate that jury instructions require the defendant "derive" support rather than require the defendant be "supported" by the prostitution earnings. Such a requirement would offer no protection to children who might actively seek support from their parent (e.g., "Can I have an allowance?"), even though they know the support comes from prostitution earnings. Such children still should not be prosecuted for pimping. Protections for such a child would likely come in the form of "prudent prosecutorial discretion" (*In re Paul C.* (1990) 221 Cal.App.3d 43, 51) rather than an appellate court enforcing a needlessly rigid rule against passive language in pimping instructions.

The court's instruction properly conveyed the actus reus requirement of pimping.

**Mens Rea**

The only knowledge requirement in section 266h, subdivision (a) is that the defendant knew the person in question was a prostitute. (§ 266h, subd.(a).) Defendant cites cases that, with little or no explanation, have added an additional knowledge requirement: that the defendant must know that the funds from which he/she is living or deriving support came from prostitution rather than legal activities of the prostitute. (See, e.g., *People v. Tipton* (1954) 124 Cal.App.2d 213, 217–218; *People v. Coronado* (1949) 90 Cal.App.2d 762, 765; *People v. Simpson* (1926) 79 Cal.App. 555, 559; *People v. Fuski* (1920) 49 Cal.App. 4, 7.) *People v. Grant* (2011) 195 Cal.App.4th 107 (*Grant*), refers to

47.

this as an "implied" requirement; therefore, we will refer to it as the implied knowledge requirement. Defendant complains the court's instruction failed to convey this implied knowledge requirement.

We reject the line of cases that have added the extra-statutory implied knowledge requirement to the crime of pimping. The statutory language is clear as to the sole knowledge element of pimping: a defendant must know the person is a prostitute. There is no requirement the defendant know the support or maintenance he/she is receiving came from the proceeds of the person's prostitution. However, it remains the case that the prosecutor must prove the support or maintenance *actually* came from the proceeds of the person's prostitution – regardless of whether defendant knew that or not.

*Grant*, *supra*, 195 Cal.App.4th 107, acknowledges the line of cases cited above and says that, as a result of their holdings, the pimping statute "does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities." It is true that the statute does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities. But that is not the result of an implied knowledge requirement, but rather a result of the plain statutory language requiring that the funds *actually* have come from the "earnings or proceeds of the person's prostitution." (§ 266h, subd. (a).) In other words, no extra-statutory implied knowledge requirement is needed to preclude liability for such a person – the plain language of the statute already precludes such liability.

*Grant* also says that because of the implied knowledge requirement, a person who accepts a known prostitute's funds gained for purposes other than the person's support and maintenance is not guilty of pimping. (*Grant*, *supra*, 195 Cal.App.4th at p. 116.) *Grant* cites *Allen v. Stratton* (C.D.Cal.2005) 428 F.Supp.2d 1064, which noted that a psychologist who provided legitimate professional service to a prostitute would not be liable even if paid with proceeds from prostitution. (*Id*., at p. 1072, fn. 7.)

It may well be true that liability cannot be imposed when funds are received from a prostitute for "purposes other than the person's support and maintenance." (*Grant*, *supra*, 195 Cal.App.4th at p. 116.) But it would not be because of the implied knowledge requirement. The reason the psychologist hypothetical is compelling is not because the psychologist would not know where his client obtained the funds used to pay (they very well might). Presumably, the psychologist should not be criminally liable even if he or she knew the prostitute client was paying with funds that came from prostitution. Rather, the hypothetical is persuasive because "the psychologist derives his support *from his own performance of services*, and not directly from the prostitute's earnings." (*Allen v. Stratton*, at p. 1072, fn. 7, italics added.) Thus, the implied knowledge requirement does not solve the problem posed by the psychologist hypothetical.

Finally, even if there was a compelling reason to add another knowledge requirement to the pimping statute, it is not the court's role to do so.

The court did not err by failing to convey a knowledge requirement that is nowhere to be found in the statute.

## VIII. Defendant's Conviction on Count 9 (Pandering of Jessica D.) Must be Reversed

Pandering under section 266i is a single crime that can be committed in a variety of ways as described in its subdivision (a). Pertinent here, subdivision (a)(1) prohibits "procur[ing] another person for the purpose of prostitution." (§ 266i, subd. (a)(1).) Subdivision (a)(2) prohibits the following: "By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute." (*Id*. at subd. (a)(2).)

**Background**

In this case, the information alleged as to count 9:

> "On or about August 12, 2016 through June 1, 2018, in the above named judicial district, the crime of PANDERING BY ENCOURAGING, in violation of PENAL CODE SECTION 266i(a)(2), a felony, was

committed by Jonathan Keith Boyd, who did unlawfully, and by threats, violence, promises, a device, and scheme, cause induce, persuade, and encourage Jessica D., another person, to become a prostitute."

In a trial brief filed September 18, 2018, the prosecutor used CALCRIM No. 1151, Alternative 1A in describing the elements of pandering.[32]

On October 5, 2018, the court and counsel held a jury instruction conference. The court asked counsel if they wanted to be heard further regarding the giving of CALCRIM No. 1151 with respect to count 9. A brief conversation between the court and the prosecutor ensued. Thereafter, the court again asked if anyone wanted to be heard further and defense counsel responded, "No."

Here, the court instructed the jury on the first element of pandering as follows: "To prove that the Defendant is guilty of pandering, the People must prove that; one, the Defendant successfully persuaded and arranged Jessica D. to become a prostitute.…"[33]

*Analysis*

The Attorney General argues that, by acquiescing in the court's instruction on count 9, defendant impliedly consented to an amendment of the accusatory pleading. As a result, defendant was "effectively" charged with violating section 266i, subdivision (a)(1), even though the information charged him with violating subdivision (a)(2). We disagree.

" '[T]he proceedings in the trial court may constitute an informal amendment of the accusatory pleading, when the defendant's conduct or circumstances created by him

---

[32] CALCRIM No. 1151 identifies several alternative forms of its first element. (CALCRIM No. 1151.) Pertinent here are alternatives 1A and 1B. Alternative 1A reads: "The defendant successfully (persuaded/procured) <insert name> to become a prostitute(;/.)" Alternative 1B reads: "[1. The defendant used (promises[,]/ threats[,]/ violence[,]/ [or] any device or scheme) to (cause/persuade/encourage/induce) <insert name> to become a prostitute[, although the defendant's efforts need not have been successful](;/.)]"

[33] Under both alternatives 1A and 1B, the second element is the same: "The defendant intended to influence <insert name> to be a prostitute(;/.)"

50.

amount to an implied consent to the amendment.' "[34] (*People v. Whitmer* (2014) 230 Cal.App.4th 906, 919, fn. omitted.) Here, the basis for implied consent urged by the Attorney General is that defendant agreed to instructions "corresponding to" section 266i, subdivision (a)(1). However, as explained below, we conclude that the court's instruction did not clearly correspond to subdivision (a)(1) to the exclusion of (a)(2). Therefore, any failure to object to the instruction cannot constitute consent to be charged with violating subdivision (a)(1).

Section 266i, subdivision (a)(1) criminalizes the behavior of a defendant who "[p]rocures another person for the purpose of prostitution." (§ 266i, subd. (a)(1).) Section 266i, subdivision (a)(2) prohibits the following: "By promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute." (§ 266i, subd. (a)(2).)

One important difference between these two provisions is that section 266i, subdivision (a)(2) refers to encouraging another person to "become a prostitute" and subdivision (a)(1) does not. (*People v. Chatman* (2019) 30 Cal.App.5th 989, 994–995.) Here, the instructions given by the court identified the first element of the crime as "successfully persuad[ing] and arrang[ing] Jessica D. *to become a prostitute*." (Italics added.) Thus, the court's instruction used the "to become a prostitute" phrasing that is unique to subdivision (a)(2). This undermines the Attorney General's argument that defendant's lack of objection to the instructions constituted consent to amend the charge *from* subdivision (a)(2) *to* subdivision (a)(1).

The court's instruction also referred to defendant *persuading* and arranging for Jessica D. to become a prostitute. It is section 266i, subdivision (a)(2), not subdivision

---

[34] However, the Supreme Court has indicated that mere failure to object to jury instructions and verdict forms cannot effect an informal amendment where the amendment does not offer any benefit to defendant. (See *People v. Anderson* (2020) 9 Cal.5th 946, 958–960; see also *People v. Arias* (2010) 182 Cal.App.4th 1009, 1021.)

(a)(1), that expressly uses the word "persuades."[35]  This too undermines the Attorney General's contention that failing to object to the instruction effected an amendment of charges from subdivision (a)(2) to subdivision (a)(1).

It is true that the instruction does not perfectly track with section 266i, subdivision (a)(2) either.  For example, the instruction does not include reference to the fact that a defendant's causation/inducement/persuasion/encouragement must be done by "promises, threats, violence, or by any device or scheme."  (§ 266i, subd. (a)(2).)  But the question is whether the instruction so clearly corresponded with subdivision (a)(1), such that it effected an informal amendment to the charge of violating subdivision (a)(2) upon defendant's failure to object.  As explained above, we answer this question in the negative.

In sum, because the court's instruction did not so clearly relate to subdivision (a)(1) to the exclusion of (a)(2), defendant's lack of objection to that instruction cannot be construed as consent to amend the charge from subdivision (a)(1) to (a)(2).

The Attorney General notes that an appellate court has held that the subdivisions of section 266i do not state different *offenses*, but rather different *circumstances* under which the crime of pandering may be committed.  (See *People v. Lax* (1971) 20 Cal.App.3d 481, 486.)  However, it is difficult to see the functional distinction between a statute defining "different offenses" versus "different circumstances" in which a crime has been committed. It seems that so long as the statutory provisions have different

---

[35] This is not to say using the word "persuaded" in jury instructions on section 266i, subdivision (a)(1) is improper. Procuring under subdivision (a)(1) includes "assisting, inducing, *persuading* or encouraging." (*People v. Schultz* (1965) 238 Cal.App.2d 804, 812, italics added.)  Our only point is that the instruction, as a whole, was arguably consistent with subdivision (a)(2) and therefore would not have put defendant on notice of an informal amendment to a different provision.

elements, they are functionally equivalent to different crimes even if they are referred to by the same name.

In any event, even where a "statute contains several provisions, the violation of any one of which is an offense, the facts should be so stated as to render apparent which provision is relied on." (*People v. Mandell* (1939) 35 Cal.App.2d 368, 372.) Here, the information *did* make it apparent which provision is relied on, and that provision was subdivision (a)(2). "It is elementary that a defendant cannot be convicted of a crime with which he is not charged." (*People v Mitchell* (1925) 74 Cal.App. 164, 169.) Because the information alleged a violation of subdivision (a)(2), a formal or informal amendment was required if the prosecutor desired to obtain a verdict on violating subdivision (a)(1).

### *Instructional Error*

Because we have concluded defendant was charged with violating section 266i, subdivision (a)(2) and that no effective amendment of that charge occurred, we must next turn to the instructional issues raised by defendant as to that charge. (See § 1259 [court may review instruction affecting defendant's substantial rights even though no objection was made in the trial court].)

The court instructed the jury: "To prove that the Defendant is guilty of pandering, the People must prove that; one, the Defendant successfully persuaded and arranged for Jessica D. to become a prostitute; and, two, the Defendant intended to influence Jessica D. to be a prostitute."

Section 266i, subdivision (a)(2) requires the prosecution to prove two separate things: that defendant (1) induced, persuaded, or encouraged another to become a prostitute (2) and he or she did so "by" one of several specific means: "promises, threats, violence, or by any device or scheme." (See § 266i, subd. (a)(2); see also *People v. Mathis* (1985) 173 Cal.App.3d 1251, 1256 [identifying elements of prior subdivision (b) with same language as current subdivision (a)(2)].) While the instructions here adequately conveyed the first requirement, it did not convey the second. This was error.

*Prejudice*

We must next determine whether this instructional error was prejudicial. Omitting an element of the *charged* offense can be harmless when the omitted element was uncontested and supported by " 'overwhelming evidence.' " (*People v. Mil* (2012) 53 Cal.4th 400, 410.) We conclude there was not "overwhelming evidence" of the promise/threat/violence/device/scheme element.

The strongest evidence that defendant induced, persuaded, or encouraged Jessica D. to engage in an act of prostitution[36] was when he told her to "charge more" for a "date," since she did not have a condom. Indeed, we will assume for the sake of argument a jury could reasonably infer that, by this statement, defendant was encouraging Jessica to engage in a future act of prostitution. However, there was no evidence that this

---

[36] Section 266i, subdivision (a)(2) refers to inducing, persuading or encouraging a person to "become a prostitute." (§ 266i, subd. (a)(2).) Case law makes clear that this law can be violated even where the person being induced/persuaded/encouraged was already a prostitute. (See *People v. Zambia*, *supra*, 51 Cal.4th at pp. 971–981.) However, it is difficult to determine what " 'become a prostitute,' " means when applied to someone who is already a prostitute. (*Id*. at pp. 982–983 (dis. opn. of Kennard, J.) & *id*. at p. 987 (dis. opn. of Werdegar, J.).) On that topic, the Supreme Court has provided the following: "The language of the pandering statute describes current conduct on the part of the defendant: inducing and encouraging. That current conduct is aimed at producing subsequent conduct by the target: that the target thereafter *engage in acts of prostitution* following a defendant's inducement or encouragement. To encourage an established prostitute to change her business relationship necessarily implies that a defendant intends a victim 'to become a prostitute' in the future regardless of her current status. We also think it safe to say that someone who encourages another to become a prostitute is seldom giving disinterested advice about a possible career path. The phrase 'encourages another person to become a prostitute' can readily be understood to encompass the goal that the target 'become a prostitute' in the future for the benefit of the encourager or some other pimp. (§ 266i, subd. (a)(2).) This interpretation of the pandering statute is consistent with long-standing case law and the Legislature's intent to combat pandering and prostitution." (*Zambia*, *supra*, 51 Cal.4th at p. 975, italics added.)

This language suggests that subdivision (a)(2) would be implicated when a defendant induces, persuades, or encourages a prostitute to engage in future *acts of prostitution*. For the sake of argument, we will assume "to become a prostitute" includes "to engage in future acts of prostitution."

54.

particular instance of "encouragement" was being done by means of a promise, threat, violence, device or scheme, as required by section 266i, subdivision (a)(2). The statement, "charge more" is not a promise or a threat, nor is it an act of violence, device or scheme.

Before turning to additional evidence cited by the Attorney General, we must address defendant's contention that the prosecutor elected to predicate count 9 solely on the "charge more" text message, and that the jury was "bound" by that election. Defendant is mistaken. As explained above, the court must instruct on juror unanimity or the prosecutor " ' "must elect the specific act relied upon" ' " in cases where the constitutional right to unanimity is implicated. (*People v. Brown*, *supra*, 11 Cal.App.5th at p. 341.) However, in cases where unanimity is not at issue, " 'the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury.' " (*Ibid.*) Therefore, we will consider the other evidence relied upon by the Attorney General in support of the "promise, threat, violence, device or scheme" element of section 266i, subdivision (a)(2).

The Attorney General points to the evidence described below to show defendant employed a "scheme" to encourage Jessica to prostitute herself. When defendant spoke with Jessica he acted like they were in a boyfriend-girlfriend relationship, but in conversations with other people would refer to her as his "main b[**]ch" or his "Mexican b[**]ch" And while defendant did call Jessica his "wife," the term "wifey" is synonymous with "main b[**]ch" according to Detective Longoria. In an interview with law enforcement, defendant referred to Jessica D. by her "prostitute name," Jasmine.

The Attorney General contends a jury could conclude from this evidence that defendant engaged in a scheme of emotional manipulation (i.e., "Romeo tactics") to encourage Jessica D. to prostitute for him. We disagree. Defendant's use of derogatory language towards Jessica, while reprehensible, is a different issue than whether he used a "scheme" to encourage Jessica to prostitute herself.

The Attorney General also points to a text message exchange between defendant and Jessica, which showed defendant's "violent side." On March 5, 2018, defendant texted Jessica saying, "Pick up." Jessica responded, "We can talk later right now im bzy." Defendant said, "B[**]ch im.telling u im gone kick that door in i dont givr a f[**]k bout you beibg buisy." Later, defendant texted: "F[**]k yo life u wont even pic up the phone n[**]ga om on yo room in ii ain movin."

Again, as inappropriate as defendant's messages were, there is no evidence they were tied to pandering. That is, there was no indication these statements – though threatening – caused, induced, persuaded or encouraged Jessica to become a prostitute. (See § 266i, subd. (a)(2).)

We cannot conclude there is overwhelming evidence of the omitted element. Indeed, our review of the evidence set forth above, establishes not only a lack of overwhelming evidence of the omitted element, but also a lack of substantial evidence. Therefore, defendant may not be retried on the charge of violating section 266i, subdivision (a)(2).[37]

## IX. The Trial Court Did Not Err in Failing to Sever Counts

Defendant argues the court erred in denying his motion to sever counts, which would have resulted in separate trials on the counts related the each of the three alleged victims, Toni, Michelle, and Jessica. We disagree.

**Background**

On September 18, 2018, defendant moved to "sever counts" in a manner that would result in one trial on counts 1 through 5, another trial on counts 6 through 7, and another trial on counts 8 through 9.[38]

---

[37] As a result, we do not discuss the remainder of the parties' contentions concerning count 9.

[38] When the motion was filed, the information incorrectly listed Toni as the alleged victim of count 5, rather than Michelle. At the September 18, 2018, hearing, the prosecutor orally moved to amend the information to reflect that Michelle was the alleged

Defendant argued there was no cross-admissible evidence between the three proposed trials and that the only common witness would be Detective Longoria; that the counts relating to Jessica, while offensive, were not as inflammatory as the charges relating to Michelle and Toni; and that the case relating to Toni was so weak that it needed to be severed from the other charges.

In the written motion, defendant argued that the crimes were not "of the same class" and were not connected in their commission. However, at the hearing on the motion, counsel conceded that the offenses were of the same classification.

Also on September 18, 2018, the prosecution and defense filed trial briefs. Both briefs summarized evidence and statements collected to that point.

The court held a hearing the same day and heard argument from counsel.

The prosecutor argued that there was cross-admissible evidence, including evidence of defendant's "knowledge … of the subculture as it relates to human trafficking and pimping behavior."

The prosecutor further observed that there were similarities to how defendant related to Jessica and Toni, including telling them both to "walk" in similar areas near the bridge. The prosecutor submitted severance would not be appropriate in light of this "continuing display of the Defendant's intent and motive and his knowledge."

The prosecutor contended the counts relating to Michelle were interrelated because the alleged motive for her rape was her refusal to work as a prostitute for defendant.

*Analysis*

" ' " '[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law.' " ' " (*People v. O'Malley*

victim of count 5, which the court granted. Defense counsel explained that the identification of counts in the motion to sever was based on counsel's understanding that count 5 pertained to Toni. Thereafter, counsel argued that counts one through *four* should "stand on their own."

(2016) 62 Cal.4th 944, 967.)  Charges of the same class are "properly joined unless the defense made such a ' "clear showing of potential prejudice" ' that the trial court's denial of defendant's severance motion amounted to an abuse of discretion."  (*Id.* at p. 968.)

"In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors:  (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case."  (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 968.)

### *Cross-Admissibility*

Defendant argues severance should have been granted because there would be no cross-admissibility of evidence at separate trials.  He contends that there was no similarity, except that both involved prostitution.  However, that is an important exception.  Moreover, they both "involved prostitution" in a specific way:  there was evidence in both cases raised an inference that defendant was an active pimp, familiar with the associated lingo and subculture.  "[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 401–402 (*Ewoldt*).)  "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent."  (*Id.* at p. 402.)  All that needs to be shown is that the charged crime and the other instance of misconduct are "sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' "  (*Ibid.*)

Defendant cites to *Ewoldt* for the proposition that "other-crime evidence" is not admissible to prove intent in cases where intent "can not reasonably be disputed." (*Ewoldt*, *supra*, 7 Cal.4th 380.) However, in that portion of the opinion, *Ewoldt* was applying the rule enshrined in Evidence Code section 352, which precludes evidence that has a probative value that is substantially outweighed by its probability of prejudicial effect. Intent evidence under Evidence Code section 1101 has a particular probative value, specifically: "Evidence of intent is relevant to establish that, assuming the defendant committed the alleged conduct, he or she harbored the requisite intent." (*Ewoldt*, at p. 406.) When the trial evidence establishes an actus reus that *inherently* demonstrates the requisite intent, then intent evidence under Evidence Code section 1101 would offer little *incremental* probative value and would therefore be excluded because its prejudicial effect would outweigh its probative value. So, for example, when the act in question is "fondling … breasts and genitals," the perpetrator's lewd "intent in doing so could not reasonably be disputed." (*Ewoldt*, at p. 406.) Additional evidence as to intent in that circumstance has limited probative value.

Here, however, the cross-admissible evidence would be incrementally relevant to prove defendant's intent in several respects. For example, evidence of defendant's involvement with prostitution and pimping is relevant to establishing the intent behind various text messages to Toni. Defendant texted her to come to the "blade" and the "track" – terms an expert testified were references to areas of prostitution activity. Defendant's familiarity with pimping makes it more likely that he knew the prostitution-related connotation of those terms and *intended* by his text messages to have Toni come and commit acts of prostitution at a particular location. Importantly, texting someone to come to the "track" does not establish a particular intent that cannot be disputed. Thus, the prosecution was entitled to offer additional evidence to establish the intent behind the text message. Such evidence had probative value.

59.

Moreover, we note that at the time of the motion to sever, defendant had not made any binding stipulation to confirm that intent would not be disputed. As such, the prosecution remained under an obligation to prove intent beyond a reasonable doubt. At the time of the motion to sever, intent evidence under Evidence Code section 1101 would have been relevant at hypothetical separate trials.

Defendant notes that Toni was being introduced to street walking prostitution while Jessica was a well-established, escort-type prostitute. This argument cannot carry the day, because at a myopic level of abstraction *any* set of charges become distinguishable between any other set of charges. The fact remains both situations involved defendant acting as a pimp.[39] The distinctions identified by defendant – such as the different "types" of prostitution Jessica and Toni were engaged in[40] – do not defeat the cross-admissibility of evidence. That is, the evidence still "support[s] the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

Defendant argues it would have been difficult to show cross-admissibility on other issues, such as identity. However, because cross-admissibility has been established on intent, it is immaterial that other grounds of cross-admissibility are not present.

Defendant contends evidence of the Michelle counts would not have been cross-admissible at hypothetical separate trials of the Toni or Jessica counts. Not so. Evidence concerning the Michelle counts would have been cross-admissible at a hypothetical trial on the Toni counts, even for propensity purposes, under Evidence Code section 1108.[41]

---

[39] While character evidence is generally inadmissible to show propensity, it can be admitted to show intent. (Evid. Code, § 1101.) The fact that defendant had acted as a pimp with respect to one woman is relevant to whether he intended to pimp another.

[40] Similar to other alleged discrepancies, such as the fact defendant was Jessica's boyfriend, while Toni had been trafficked.

[41] Defendant argues the propensity inference between the Toni and Michelle counts is too weak to satisfy Evidence Code section 352. He contends that consensual sex with a 14-year-old has no propensity connection with raping an adult woman. But

60.

(See Evid. Code, § 1108; see also *People v. Williams* (2016) 1 Cal.5th 1166, 1196–1197 [Evid. Code, § 1108 permits evidence admitted to show propensity].) And evidence of defendant's efforts to pimp Michelle would have been cross-admissible at both hypothetical separate trials on the issue of intent under Evidence Code section 1101.

### *Alleged "Spillover" Effect*

Defendant also observes that the prosecution's cases regarding Toni and Jessica each had weaknesses. Defendant points to issues regarding the identity of the perpetrator of offenses against Toni and contends his conduct with respect to Jessica was not criminal.

The trial court found that joinder of the charges was not likely to cause the jury to convict the defendant of weaker charges. We find no error in this determination.

We disagree that the prosecution's proffered evidence that defendant was the perpetrator of the crimes against Toni was weak. While defendant did contest the issue, the proffered prosecution evidence – including the connection between the (xxx)xxx-9149 number and a Facebook profile with defendant's pictures – strongly supported an inference that defendant was the author of the incriminating text messages sent to Toni's phone. The number was also the one defendant's probation officer used to contact him. When Detective Mares dialed the number, the phone defendant had brought to the probation officer rang. The fact that defendant contested the issue of identity and had some evidence in his favor does not mean the prosecution's case was "weak."

Defendant also contends the evidence pertaining to the counts involving Jessica was "weak." His arguments track the ones he made against the sufficiency of the evidence at trial: defendant's "advice" to Jessica was not conveyed by one of the means

---

that is not the only plausible connection between the two crimes. For example, in Toni's case, the prosecution was entitled to adduce evidence that defendant induced Toni to commit commercial sex acts by force, fear, coercion, etc. And evidence that defendant sought to induce another woman (i.e., Michelle) to commit commercial sex acts, and responded violently when she refused, is relevant to that issue.

61.

specified in section 266i, subdivision (a)(2); defendant did not commit an actus reus with respect to the pimping charge; and the prosecution did not indicate how they could prove the funds Jessica deposited on defendant's jail account came from prostitution. We have established the viability of the prosecution's theories in our analysis of defendant's substantial evidence challenge. This analysis is applicable here, where defendant has claimed the proffered evidence before the court when the motion to sever was heard was *stronger* than the evidence actually adduced at trial.

### *Inflammatory Allegations*

Defendant next contends it was prejudicial to join Jessica's and Toni's cases together, because Toni's case included highly inflammatory charges that could prejudice the verdict in Jessica's case. Similarly, he contends it was prejudicial to join Michelle's case with Jessica's and Toni's cases because Michelle's case involved inflammatory charges.

All three cases involved repulsive behavior. However, it is true that Toni's age makes the charges against her more egregious than the crimes involving Jessica.[42] Furthermore, it is true that sex crimes against children can be inflammatory. (*People v. Simon* (2016) 1 Cal.5th 98, 124.) "But the animating concern underlying this factor is not merely whether evidence from one offense is repulsive, because repulsion alone does not necessarily engender undue prejudice." (*Ibid.*) "Rather, the issue is 'whether " 'strong evidence of a lesser but inflammatory crime might be used to bolster *a weak prosecution case*' on another crime." ' " (*Ibid.*, italics added.) For example, a brutal rape can be joined to a separate robbery where the evidence of the robbery is not weak. (*Ibid.*)

The prosecution's case on the charges related to Michelle did not appear weak before trial. Michelle offered a detailed and specific account of how defendant forcibly

---

[42] Also, forcible rape is a particularly egregious crime.

raped her. While the jury did not ultimately convict on these counts, we cannot say the case appeared particularly weak at the time of the motion to sever.

Similarly, while the charges related to Toni involved more egregious behavior than the charges related to Jessica, the prosecution's case on the charges related to Toni was not weak.

Finally, the charges against Toni "cannot be characterized as the 'lesser' crimes" (*People v. Simon*, *supra*, 1 Cal.5th at p. 125) vis-a-viz the Jessica counts. Thus, there was not substantial danger that " ' " 'strong evidence of a *lesser* but inflammatory crime' " ' " would be used to bolster a " ' " 'weak prosecution case' " ' " on another crime." (*Id.* at p. 124, italics added; see also *id.* at p. 125 [distinguishing appellate case that had held joinder improper where inflammatory evidence was used to bolster a "more serious – but weaker" case; and concluding specific murders at issue "cannot be characterized as the 'lesser' crimes"].)

Moreover, even if there were some possible threat of prejudice from the other factors, cross-admissibility suffices to negate prejudice. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 948; *People v. Bradford* (1997) 15 Cal.4th 1229, 1315–1316.)

### *Due Process*

Defendant argues that even if the trial court's denial of the severance motion was correct at the time it was made, the joinder of charges in his cases resulted in a grossly unfair trial amounting to a denial of due process.

" 'Even if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the "defendant shows that joinder actually resulted in 'gross unfairness' amounting to a denial of due process." ' " (*People v. Scott* (2015) 61 Cal.4th 363, 396.) To prevail on such a claim, defendant must show it was reasonably probable that the jury was influenced by the joinder in its verdict of guilt. (*People v. Merriman* (2014) 60 Cal.4th 1, 49.)

63.

For the reasons explained in the preceding sections, we conclude it was not reasonably probable that the jury was influenced by the joinder of charges. Defendant's citation to differences between evidence anticipated at the time of the motion to sever and what was actually introduced at trial do not dissuade us.

First, defendant says the prosecutor's pretrial brief "implied" Toni would identify defendant at trial. Not so. The prosecutor's brief said that Toni confessed to her mother that she had not been truthful to Detective Longoria and refused to identify defendant because she did not want him to get in trouble. This is not equivalent to opposing the motion to sever on the grounds that Toni would identify defendant at trial. In any event, the actual evidence at trial – even without a trial identification by Toni – strongly supported the inferences that (1) the author of text messages from (xxx)xxx-9149 was the perpetrator of the offenses against Toni and (2) defendant was the author of the text messages from (xxx)xxx-9149. Again, contrary evidence and argument cited by defendant did not render the prosecution's case "weak."

Second, defendant says the parties expected Jessica to testify, though she ultimately did not. Defendant is mistaken. Defense counsel specifically argued at the hearing on the motion to sever that he did not "expect" Jessica to "show up" at trial "from what I'm hearing."

Defendant observes that the prosecution initially relied, in part, on the August 2016 jail call to support count 9, the pandering of Jessica. However, at trial, Detective Longoria withdrew his opinion that defendant was the caller in the August 2016 call. We agree this was a notable change in the strength of the prosecution's case as to count 9 from the time of the motion to sever compared to the end of trial. But we have reversed that count on other grounds. (See Discussion, part VIII., *ante*.)

In contrast, the August 2016, jail call was not critical to the prosecution's case on count 8 – pimping Jessica. That count was based on Jessica's deposit of money onto defendant's jail account and a separate jail call where defendant identified Jessica as the

64.

means by which he paid bills. Defendant has not shown it is reasonably probable the jury was influenced by the joinder in rendering a guilty verdict on count 8. (*People v. Merriman*, *supra*, 60 Cal.4th at p. 49.)

Defendant argues the evidence regarding Michelle was weaker than anticipated for several reasons, including: her testimony differed in specifics from her pretrial statements, she did not tell her relative Efrain that she had been raped until they were in the emergency room, and the motel where the rape allegedly occurred had no record of defendant staying there. However, the question is not whether the prosecution's case was weaker *than expected*, but rather whether it was weak enough to risk an improper verdict by the jury. The fact remains that Michelle unequivocally testified that defendant (whom she knew as "Blue") forced sexual intercourse upon her against her will. A year and a half later, Michelle identified defendant with "certainty" in a photographic lineup as her rapist. While the prosecution's case was not perfect, we cannot say it was so weak as to risk undue prejudice from joinder.

Defendant's arguments concerning the inflammatory nature of the charges involving Toni and Michelle were addressed above.

### Instructions Regarding Cross-Admissibility

Defendant argues the court received no instruction on the non-cross-admissibility of the evidence other than the following instruction: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one."

In a separate instruction, the court instructed jurors, "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial."

Defense counsel emphasized this instruction to the jury during closing summation saying, "The fact is that the judge has told you that you are to consider each count

65.

separately. So, each count which means each individual … alleged victim as well as each count has to be considered separately from the others."

In closing, the prosecutor told the jury, "So, when you are considering the evidence in this case, you don't necessarily consider evidence in a vacuum. You consider it as it relates to the other evidence that you've heard in the case." Shortly thereafter, the prosecutor continued, "I believe the actual language in the jury instruction is you impartially compare and consider all the evidence presented at trial. And so to be focused on not just one sole piece of evidence, you know, you consider it and evaluate that as you do, but it's all the evidence in the case is what was presented before you."

Later, in rebuttal, the prosecutor recounted threatening text messages defendant had sent to Toni. The prosecutor then said, "Michelle didn't know that there would be other evidence that he treated someone very similar to how he treated her. But that's, in fact, what he did. And that same tactic was used with Jessica."

The prosecutor proceeded to describe the aggressive text messages defendant had sent to Jessica before arguing: "This is who the Defendant – this is how he works with these women. Don't think just because Jessica is under the misguided belief that he's something special that he's not violent. Because this is what he does. This is part of his – part of his recruitment and part of his maintenance."

> "[I]f there are two reasonable inferences, then you would draw on the reasonable inference. So, if one of those inferences … that's reasonable points to innocence, then you have to choose innocence. But what is the key word is that the inference has to be reasonable in light of all the evidence. It's not a matter of this count only uses this evidence. [¶] The entire evidence is before you in this case and when you review all the evidence and compare it to each other and based on the totality of the circumstances, there is no reasonable explanation for all the different connections of the Defendant to his phone number…."

Defendant contends the court's alleged lack of instruction on noncross-admissibility combined with the prosecutor's arguments, further established a due process violation.

66.

First, we observe that defendant assumes the jury should have been instructed on non-cross-admissibility when, in fact, we have concluded that some of the evidence was indeed cross-admissible. (See Discussion, part IX., *ante*.)  A blanket instruction on noncross-admissibility would have been improper.

Second, defendant argues that the prosecutor's argument "takes the recruitment tactics displayed in the Toni case, the violence (forcible rape) displayed in the Michelle case, and the abusive language used in the Jessica case and combines them to create a profile of appellant…."  Not so.  The prosecutor was not cherry-picking aspects of defendant's conduct unique to each victim but rather was doing the opposite: arguing that defendant engaged in similar or related behavior *across* victims.  The prosecutor did not just reference "the abusive language used in the Jessica case," but instead argued that defendant used the same abusive language tactics with Toni as well.

Similarly, the evidence that defendant responded violently to Michelle's refusal to comply with defendant's requests that she prostitute herself is relevant to defendant's intent in sending certain text messages to Toni.  Whether defendant trafficked Toni in a manner involving force, fear, coercion, violence, duress, menace, or threat of unlawful injury, etc. (see § 236.1, subd. (c)(2)) was expressly relevant to a charge against him.

### *Fines and Fees Claims are Moot*

As explained above, we are remanding for resentencing following the reversal of the conviction on count 9.  "[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant." (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.)  Because the trial court may revisit all prior sentencing decisions, and it is uncertain whether or to what extent the fines and fees will be reimposed at resentencing defendant's challenges to the previously imposed fine and fees

are moot.  Nothing in this opinion would prevent him from raising these issues at resentencing.[43]

## DISPOSITION

Defendant's conviction on count 9 is reversed.  Defendant may not be retried on the charge of violating Penal Code section 266i, subdivision (a)(2).  The matter is remanded for a full resentencing.  In all other respects, the judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, ACTING P. J.


SNAUFFER, J.

---

[43] Defendant argues that if this matter is remanded, arguments concerning his ability to pay should be addressed to the trial court on remand.  We agree and express no opinion on any such arguments.